UNIVERSAL HEALTH SERVICES,
INC., RCW of Edmond, Inc., Renais-
sance Women's Center of Austin
L.L.C., and Renaissance Women's
Center of Austin, L.P.,

v.

RENAISSANCE WOMEN'S
GROUP, P.A.

No. 02–0193.

Supreme Court of Texas.

Argued on April 16, 2003.

Decided Sept. 30, 2003.

Marcy H. Greer, Mary S. Dietz, Ful-
bright & Jaworski, Paul Denton Trahan,

Douglas Alexander, J. Woodfin Jones, Alexander Dubose Jones & Townsend, LLP, Steve Selby, Scott Douglass & McConnico, L.L.P., Austin, for petitioner.

Roy Q. Minton, Minton Burton Foster & Collins, P.C., James Alan Hemphill, Patrick Lawrence Reznik, R. James George, Jr., George & Donaldson, L.L.P., W. Amon Burton, Austin, Charles G. Orr, Nina Cortell, Barry F. McNeil, Haynes & Boone, L.L.P., Dallas, for respondent.

Chief Justice PHILLIPS delivered the opinion of the Court.

This is a suit on a lease and accompanying letter agreements. A group of physicians contracted to lease office space for ten years in a building which also housed a hospital where they would practice. About two years into the lease term, the owners decided to close the hospital for financial reasons and notified the physicians of their intentions. The doctors sued, alleging that the owner was bound by the lease and letter agreements to operate the hospital for the entire term of the lease. The trial court granted a temporary injunction, enjoining the owners from closing the hospital until trial, which was affirmed by the court of appeals. *Universal Health Services, Inc. v. Margaret Thompson, M.D.*, 24 S.W.3d 570 (Tex.App.-Austin 2000, no pet.). However, the trial court later determined that it could not require the hospital to stay open and granted the owners a partial summary judgment on the issue of specific performance. After a jury trial, the trial court rendered judgment for the physicians on a favorable verdict awarding future damages, and the court of appeals affirmed. *Universal Health Services, Inc. v. Margaret Thompson, M.D.*, 63 S.W.3d 537 (Tex.App.-Austin 2001). We conclude that the agreements were not ambiguous;

as a matter of law they did not obligate the owner to operate the hospital for the entire term of the lease. Accordingly, we reverse the court of appeals' judgment and render judgment that the physicians take nothing.

I

In 1994, Mike and Frank Schuster approached Universal Health Services, Inc., a health care management company, regarding a new approach to women's health care the Schusters had implemented in Oklahoma. The Oklahoma facility, called the Renaissance Center, combined a hospital and obstetrical/gynecological office space in one building, enhancing convenience to both doctors and patients. Universal, along with other shareholders, incorporated RCW of Edmond, Inc. to invest in developing women's health centers like the Oklahoma hospital.

In 1996, RCW of Edmond, Inc. purchased the assets of the Schusters' company, including a nascent project in Austin, Texas. The previous year, the Schusters contacted two physicians, Dr. Margaret Thompson and Dr. Linda Litzinger, to promote their multi-service women's health center concept. Dr. Thompson and Dr. Litzinger liked the idea, agreeing to create a Renaissance Center in Austin. The Schusters' company, Renaissance Centers for Women, Inc.,[1] entered into a letter agreement and lease with the physicians' professional association, Thompson & Litzinger, P.A., in October 1995. That agreement obligated Renaissance Centers for Women, Inc. to locate property upon which the center would be built, develop plans for and construct the center, and obtain all licenses and permits to operate the center. Furthermore, the company agreed to use

---

**1.** Despite the similarity in names, Renaissance Centers for Women, Inc. bears no corporate relationship to any of the parties here.

RCW of Edmond, Inc. purchased the company's assets, but not the company itself.

reasonable efforts to obtain written agreements certifying the hospital as an approved hospital by insurance companies and managed care providers during the term of the lease. In 1996, after RCW of Edmond, Inc. acquired Renaissance Centers for Women, Inc.'s assets, the physicians entered into another letter agreement approving a site for the facility and substituting Renaissance Women's Center of Austin, L.P., a limited partnership formed by RCW of Edmond, Inc. for the purpose of developing the Austin project, as the landlord under the lease.

Renaissance Women's Center of Austin, L.P., purchased land and built a two-story hospital and office building which opened in September 1997. By the end of 1999, the hospital had sustained operating losses of over $2 million a year above and beyond the expected start-up losses. The doctors, on the other hand, had enjoyed great financial success in their new location. Universal had provided the initial capital expenses for constructing and opening the center and had thereafter funded the substantial operating losses since its opening. In late 1999, Universal advised the physicians of its decision to close the hospital.

The physicians brought suit for breach of contract and fraud, seeking damages and injunctive relief to prevent Universal from closing the hospital.[2] The trial court granted the physicians' application for a temporary injunction, effective only until trial, and the court of appeals affirmed. 24 S.W.3d 570 (Tex.App.-Austin 2000, no pet.). Universal then moved for partial summary judgment on the physicians' request for specific performance, and the trial court granted that motion, determining that it could not order Universal to keep the hospital open. In the trial court,

both parties moved for summary judgment, arguing that none of the agreements were ambiguous. The physicians neither pleaded nor offered proof that a covenant to operate the hospital during the lease term should be implied into the lease or the letter agreements. The trial court concluded, contrary to the parties' contentions, that both the lease and letter agreements were ambiguous. The jury resolved these alleged ambiguities by finding, based on the lease and letter agreements, that Universal had agreed to operate the hospital for the entire 15-year lease term, awarding the physicians $5.6 million for the breach of contract and $1.3 million in attorney's fees. The jury failed to find fraud. The trial court rendered judgment on the verdict, and the court of appeals affirmed.

II

Universal challenges the legal sufficiency of the evidence supporting the jury's finding that the agreement and lease required it to operate the hospital for the entire 15-year term, arguing that the lease is reasonably susceptible only to the interpretation that the contract does not impose such an obligation and is therefore unambiguous. Universal argues that the physicians are really seeking an implied covenant, a legal theory they failed to assert below.

Conversely, the physicians assert that language in the three agreements unambiguously obligates Universal to operate the hospital for the lease term, or, in the alternative, creates an ambiguity that the jury correctly resolved in their favor. First, the 1995 Letter Agreement states

---

**2.** The physicians' suit was confined to claims arising from the hospital closure and did not concern the office space the physicians leased. Universal informed the physicians at the time it closed the hospital that they could remain in the space or abandon the leasehold without any penalty.

Renaissance and Thompson & Litzinger contemplate participating in the project to be known as Renaissance Women's Center of Austin (the "Project") which will be composed of a women's hospital located on the first floor of the Project and medical offices and clinic leased to [the Physicians] located on the second floor of the project.

It also provides that

[b]y the signatures of Renaissance and Thompson & Litzinger below, Renaissance and Thompson & Litzinger agree that the validity and binding effect of the Lease are subject to the following terms and conditions:

. . .

4. Upon substantial completion of the Project and the Premises, Renaissance shall use diligent efforts to obtain all licenses and permits required by the State of Texas and any other governmental authority having jurisdiction over the Project to operate the women's hospital to be located on the first floor of the Project. In the event that Renaissance cannot obtain all such licenses and permits required under this paragraph . . ., then either Renaissance or Thompson & Litzinger may terminate the Lease . . .

. . .

5. Renaissance shall use reasonable efforts to obtain, and maintain in full force and effect throughout the Term of the Lease, written agreements . . . certifying the Project as an approved hospital by all health insurance companies, health maintenance organizations, health care plans or other health care benefit providers for which Thompson & Litzinger . . . are approved providers. . . . In the event that Renaissance does not obtain and maintain Approved Hospital Agreements from all Benefits Providers designated to Renaissance by Thompson & Litzinger as provided above, Renais-

sance will obtain and maintain written agreements with Benefit Providers satisfactory to Thompson & Litzinger.

Furthermore, the 1995 Letter Agreement states it will remain binding "throughout the term of the lease."

The 1996 Letter Agreement provides that the Renaissance Center "is to be composed of a woman's [sic] hospital to be located on the first floor of the Project, and medical offices and clinic leased to [the Physicians] to be located on the second floor of the Project." Finally, the 1997 Second Modification and Ratification of the Lease Agreement makes the physicians "bound by all of the obligations and rights . . . under the Lease and associated documents" and committed the physicians to leasing the premises for ten years with a five-year option to renew.

■■■ "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). If contract language can be given a certain or definite meaning, then it is not ambiguous; it should be interpreted by a court as a matter of law. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999). Lack of clarity does not create an ambiguity, and "[n]ot every difference in the interpretation of a contract . . . amounts to an ambiguity." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). Rather, an ambiguity arises when an agreement is susceptible to more than one reasonable meaning after application of established rules of construction. *DeWitt County Elec. Coop., Inc.*, 1 S.W.3d at 100.

■■■ The language cited by the physicians does not expressly impose an obli-

gation to operate the hospital for the entire lease term, nor can it be reasonably read to do so. First, the terms in the 1997 Second Modification and Ratification of the Lease Agreement, providing that the physicians were "bound by all of the obligations and rights ... under the Lease and associated documents" and had committed to leasing the premises for 10 years with a five-year option, makes no mention of Universal's obligation. Nor do the provisions in the 1995 Letter Agreement which state that it "shall remain in effect and binding on [Universal and Physicians] throughout the term of the Lease" and that "[i]n the event of any conflict or inconsistency between the provisions of this letter agreement and the provisions of the Lease, the provisions of this letter agreement shall govern and control" impose any obligation to operate the hospital for the entire term of the lease. These terms are merely general statements of what agreement will control in the event of a conflict and that the obligations in the 1995 Letter Agreement will continue throughout the lease. They cannot be stretched to impose any obligations not already found elsewhere in the contract.

 Nor does the language in the 1995 and 1996 Letter Agreements stating that the project "will be composed of a women's hospital located on the first floor of the Project and medical offices and clinic leased to [the Physicians] located on the second floor" impose an obligation to operate the hospital throughout the lease term. In *Weil v. Ann Lewis Shops, Inc.*, the lessor sought damages as a result of the tenant's failure to use leased property as a retail store. 281 S.W.2d 651, 653 (Tex.Civ. App.-San Antonio 1955, writ ref'd). The lease provided that the occupancy and use was to be "for the conducting of a retail store for the sale of 'Ladies', Misses' and Children's ready to wear and accessories and not otherwise,'" and gave a percentage of the store's profits as additional rent.

In fact, the leased premises were never occupied and the store never opened, but the tenant did pay the base rent under the lease. We held that this language did not expressly impose an obligation to use the premises as a store, but rather was a restrictive covenant not to use the property for any other purpose. *Id.* at 654. We concluded that " 'a provision in a lease that the premises are to be used only for a certain prescribed purpose imports no obligation on the part of the lessee to use or continue to use the premises for that purpose; such a provision is a covenant against a noncomplying use, not a covenant to use.' " *Id.* (quoting *Dickey v. Philadelphia Minit–Man Corp.*, 377 Pa. 549, 105 A.2d 580, 581 (1954)). Here, the language that the project "will be composed of a women's hospital ... and medical offices and clinic" is only a general description of the project, not an obligation on either party. Similarly, the language regarding Universal's obligation to acquire permits and insurance agreements does not impose an obligation to operate the hospital. Thus, the court of appeals erred in holding that the agreement is ambiguous and that the trial court properly submitted its meaning to the jury.

 Generally, a court looks only to the written agreement to determine the obligations of contracting parties. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981). In rare circumstances, however, a court may imply a covenant in order to reflect the parties' real intentions. Obviously, courts must be quite cautious in exercising this power. *See Freeport Sulphur Co. v. Am. Sulphur Royalty Co. of Tex.*, 117 Tex. 439, 6 S.W.2d 1039, 1041 (1928). "The court cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply

certain duties and obligations in order to effect the purposes of the parties in the contracts made." *Id.* at 1040. An "implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it...." *Danciger Oil & Refining Co. of Tex. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941). Thus, a covenant will not be implied simply to make a contract fair, wise, or just. *Id.*

 We need not decide whether the lease or letter agreements might imply an obligation on Universal to operate the hospital for the term of the lease. The physicians failed to plead an implied covenant. *See Nalle v. Taco Bell Corp.,* 914 S.W.2d 685, 687 n. 2 (Tex.App.-Austin 1996, writ denied). In the court of appeals, the physicians' brief stated that they had "never relied on a theory of 'implied covenant.'" In their response to Universal's petition for review in this Court, they said, "This is not, and has never been, an implied covenant case." Thus, the physicians have waived any right to an implied covenant of continuous operation.

While the language on which the physicians rely does not create an absolute obligation to keep the hospital open throughout the lease term, the contract does impose an obligation to use "reasonable efforts to obtain, and maintain" written hospital agreements. The physicians' pleadings alleged this language as an alternative basis of recovery, but they abandoned the "reasonable efforts" theory at trial. Instead, they submitted only the question of continuous operation to the jury. But, as we have discussed, the contract did not require Universal to operate the hospital regardless of profitability

throughout the lease term, and thus the jury finding is immaterial.

Because we hold that the contract does not impose an obligation to operate the hospital for the entire lease and that the physicians did not submit the reasonable efforts theory to the jury, we reverse the court of appeals' judgment and render judgment for Universal.