The Burlington Northern and Santa Fe Railway Company v. Lyden Air Freight d/b/a Skytrack

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-05-069-CV

THE BURLINGTON NORTHERN APPELLANT

AND SANTA FE RAILWAY COMPANY

V.

LYNDEN AIR FREIGHT D/B/A APPELLEE

SKYTRACK

------------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

In two issues, the Burlington Northern and Santa Fe Railway Company (“BNSF”) asserts that the trial court erred by (1) granting the motion for summary judgement filed by Lynden Air Freight d/b/a Skytrack and denying BNSF’s corresponding motion and, alternatively, (2) failing to find that a contractual ambiguity created a fact question to be determined by the trier of fact.  We reverse and remand.

II. Background

In 2001, BNSF was exploring ways that it could more efficiently transport goods it purchased for its own use from one location to another.  An example posited by BNSF is air filters purchased in Baltimore for use in Barstow, California, that needed to be transported, from Baltimore to California.  Under the then-existing system, a contracted trucking company would simply ship the air filters for BNSF either TL (truckload) or LTL (less than truckload).

BNSF issued a “request for proposal” to several companies for a cheaper way to inventory, warehouse, and distribute such items, including an estimated savings to BNSF from the responding companies.  Skytrack responded with a proposal that would “reduce BNSF’s overall hard costs at least 30% over direct LTL/TL services” and anticipated “[s]ubstantially reduced LTL, [TL], air freight, and expedited transportation charges – 
overall estimated savings of at least 30%
.
”

According to BNSF, Skytrack’s proposal would work thusly:  Skytrack would arrange for local cartage, regional LTL, or other contracted service to transport the air filters from the supplier in Baltimore to a centrally located “Skytrack Consolidation Center,” for example, in Chicago.  Skytrack would then consolidate those materials with materials that BNSF had purchased from other suppliers bound for the same regional destination, place the consolidated goods on a trailer, and then transport the consolidated material via another cartage company retained by Skytrack from the consolidation center to a railroad terminal.  The trailer would then be loaded on one of BNSF’s own trains and transported to another Skytrack consolidation center located nearer the point of use, for example, in Los Angeles.  Skytrack would then unload the trailer and sort the goods for delivery to various final end-use destinations, like the air filters for Barstow.  The final delivery to Barstow would be made by Skytrack through its use of third-party local cartage, regional LTL, or other contracted services.

Skytrack’s explanation of their proposal is similar:  instead of having BNSF pay for the air filters to be transported separately LTL from point of shipment, Baltimore, to point of delivery, Barstow, BNSF would pay for the goods to be trucked to a consolidation center, Chicago, run by Skytrack.  Skytrack would then consolidate the air filters into a single trailer, if possible, along with other BNSF goods destined for the same geographical area.  This trailer of consolidated freight would next be loaded on BNSF’s own flat cars (called “Intermodal” or Trailer On Flat Car (TOFC)) to be transported by train to another Skytrack consolidation center, say Los Angeles, near its destination, Barstow.  Skytrack would then arrange for final delivery, for which it invoiced BNSF.

After negotiations, BNSF and Skytrack entered into a contract, effective August 8, 2001, regarding Skytrack’s proposal.  Under the contract, Skytrack charged BNSF for five different services, set forth in Exhibit A to the contract: (1) a “terminal service charge” at the initial consolidation center to consolidate into trailers the separate cargoes that arrived there; (2) “drayage” to move the trailers from the Skytrack consolidation center to the nearest BNSF terminal, where it was loaded for TOFC transportation on BNSF’s flatcars, and then from the BNSF terminal to the Skytrack center for deconsolidation; (3) “cartage,” also called “pickup and delivery,” to transport the goods after they were deconsolidated for delivery to their destination; (4) “line haul” charges for particularly long cartage; and (5) “miscellaneous” and hourly charges such as hosling (or hosteling).  These were all of Skytrack’s charges to BNSF.  Skytrack asserts that these were “Contractor actual charges” as provided by the contract.

Skytrack asserts that it did not charge BNSF for any initial transportation to a Skytrack consolidation center performed by an LTL carrier, as the contract did not allow for it.  Those LTL costs were “BNSF fees” charged by LTL carriers directly to, and paid directly by, BNSF.  In addition, for any TOFC transportation segment, Skytrack alleges that those costs were borne or incurred solely by BNSF: the contract did not allow Skytrack to charge for TOFC costs.

The first paragraph of the contract identifies the parties.  It reads as follows:

THIS AGREEMENT is made and entered into as of August 8, 2001, the “Effective Date”, by and between THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, a Delaware corporation (hereinafter “BNSF” or the “Railroad”); and LYNDEN AIR FREIGHT, INC., a Washington corporation, dba SkyTrack, (
hereinafter 
“
SkyTrack
”
 or the 
“
Contractor”
)
.  
(Emphasis supplied.)

Another paragraph, proposed by Skytrack and accepted by BNSF, addressed the promised savings:

The methodology for computing historical BNSF costs and expenses, for purposes of comparison with Actual CONTRACTOR Charges, shall be mutually developed and agreed upon.  In this connection, CONTRACTOR guarantees that 
BNSF total CONTRACTOR actual charges
 will be at least 25% less than BNSF Historical total costs and expenses would have been for movement of identical materials and volumes utilizing any other services. . .
 
.
  
In addition, Skytrack and BNSF will jointly develop quality performance measurements and review results on a quarterly basis. [Emphasis supplied.]

Using the previous example, under the contract as entered into by the parties, Skytrack would arrange for an air filter to be transported from Baltimore by carrier to a Skytrack consolidation center in Chicago, where it would be consolidated with other items moving to a similar location as the air filter, and then transport the items by rail to another closer-to-destination consolidation center in Los Angeles, where it would again be transported by carrier to its final destination in Barstow.  Initially, the third-party carriers were paid by Skytrack and then the costs were passed to BNSF, but later BNSF paid these third-party carriers directly.

Skytrack had wanted a guaranteed minimum amount of freight, but BNSF would only provide historical data on the amount of freight involved.  For comparison purposes, transportation costs were agreed to historically have been $11.60 cwt (per hundred weight).  Skytrack asserts that, based on its experience, it felt that it could meet the 25% savings goal based on the $11.60 figure, even without a volume guarantee, based on the assumption that it was guaranteeing that only its own costs would be 25% less than corresponding previous costs because it could not control costs other than its own.

Problems arose as to whether the savings expected by BNSF were being achieved.  Skytrack asserts that the historical volumes provided as a benchmark by BNSF were never met.  BNSF asserts that Skytrack’s own calculations showed that the promised savings did not occur.  BNSF subsequently demanded a refund of $843,078.01 for the period of January 1—September 30, 2002, invoking the remedy clause in the contract, which reads as follows:

In the event CONTRACTOR total actual charges are not at least 25% lower than similar Historical BNSF total average costs and expenses, CONTRACTOR will refund BNSF an amount equivalent to the net deficit or a full refund of CONTRACTOR charges for the period examined (whichever is less) within 30 days following completion of comparison, or BNSF may, at its option, cancel the remaining term of the agreement without further obligation.

Skytrack asserts that this demand was sent despite the fact that the parties had agreed to come to mutually acceptable methods of calculating savings after the types of shipments and volumes had become established, which methodology had never been agreed upon.

Skytrack responded to the demand by letter of October 20, 2002, informing BNSF that it had already saved BNSF hundreds of thousands of dollars because the charges to BNSF from Skytrack were $4.09 cwt, much lower than the historical cost of $11.60 cwt.  Negotiations failed, and on February 24, 2003, BNSF cancelled the contract and asked for a refund of $1,166,217.  Litigation ensued.

After discovery, each party filed a motion for summary judgment regarding the interpretation of the phrase “BNSF total contractor actual charges,” each urging the same interpretation as in this appeal.  Skytrack also asserted that BNSF was barred from seeking a refund because it had elected to cancel the contract, and BNSF could not both cancel and be entitled to a refund under the terms of the contract.  The trial court granted Skytrack’s motion, finding that it had “exceeded the requirements of the contract guarantee,” and denied BNSF’s motion, finding that BNSF was “entitled to no refund.”  This appeal by BNSF resulted.

III.  The Disputed Phraseology

As posited by BNSF, in addition to the calculation of a refund, if warranted, “the only issue[] in this case [is] interpretation of the phrase ‘BNSF total Contractor actual charges’” because these charges, compared to the historical total costs and expenses, were the basis for the guaranteed 25% savings, and hence were the basis for determining whether Skytrack had met its contractual obligations.  BNSF’s position is that this phrase includes all costs charged by third-party contractors associated with the movement of BNSF goods through the Skytrack system, whether billed to BNSF directly or through Skytrack.  In the example previously used, the charges would be all expenses incurred in moving the air filter from Baltimore to Barstow.  BNSF points to the following as support for its position:  (1) the purpose of the entire contract from its inception was to receive proposals to reduce BNSF’s overall shipping costs from origination (Baltimore in our example) to destination (Barstow in our example), not only a portion of the total shipping costs; (2) Skytrack used all third-party contractor costs in its post-contract reports to BNSF, including various documents showing the savings ranging from a low of 9.2% to a high of 18.45%, and admitted that it was not meeting its 25% cost-reduction goal, (3) the $11.60 cwt figure used by Skytrack for its benchmark for historical savings comparisons included third-party contractor expenses for origin-to-destination purposes; (4) the contractual language calls for costs comparisons to the costs and expenses associated with the
 transportation and distribution 
of similar materials and volumes, and (5) the use of the word “total” in the phrase “total Contractor actual charges” shows that more than just Skytrack’s actual charges was intended.

On the other hand, Skytrack’s position is that the phrase means only Skytrack’s actual charges and does not include third-party expenses.  In our ongoing example, under Skytrack’s view, the phrase would include only charges for the work done by Skytrack after the air filters reached the consolidation centers.  Skytrack supports its position with the following arguments:  (1) a literal reading of the phrase “total Contractor actual charges” is “total Skytrack actual charges” because the contract defines ”Contractor” as “Skytrack”; (2) Skytrack has control over its costs and charges only, not over third-party contractors, and could not guarantee savings from third-party charges; (3) the contract was drafted with the language in question to protect Skytrack’s liability because BNSF would not guarantee a minimum volume of freight; and (4) using this literal interpretation is the only way to make other portions of the contract’s use of “Contractor” read in a sensible manner.  Each party takes issue with the other party’s interpretation of the contractual phrase.

IV. Legal Analysis

A. Summary Judgment

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  
Tex. R. Civ. P.
 166a(c); 
Sw. Elec. Power Co. v. Grant, 
73 S.W.3d 211, 215 (Tex. 2002); 
City of Houston v. Clear Creek Basin Auth.
, 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.  
Sw. Elec. Power Co., 
73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.
  Valence Operating Co. v. Dorsett
, 164 S.W.3d 656, 661 (Tex. 2005).
  
Evidence that favors the movant’s position will not be considered unless it is uncontroverted.  
Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.
, 391 S.W.2d 41, 47 (Tex. 1965).

The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant’s cause of action or defense as a matter of law.  
Clear Creek Basin
, 589 S.W.2d at 678.

B. Ambiguity

A contract is ambiguous when its meaning is uncertain and doubtful or if it is reasonably susceptible to more than one interpretation.
 
 
Gutierrez v. Elizondo
, 139 S.W.3d 768, 775 (Tex. App.—Corpus Christi 2004, no pet.).  Likewise, a contract is unambiguous if it can be given a definite or certain legal meaning.  
J.M.
 
Davidson
,
 Inc. v. Webster
,
 
128 S.W.3d 223, 229 (Tex. 2003).  A lack of clarity alone does not create an ambiguity, nor does every difference in interpretation.  
Universal Health Care Servs. Inc. v. Renaissance Women’s Group P.A.
,
 
121 S.W.3d 742, 746 (Tex. 2003).  Rather, for an ambiguity to exist, both 
competing interpretations of contractual language must be reasonable.  
Lopez
 
v
. 
Munoz
,
 Hockema & Reed
 
L.L.P.
, 22 S.W.3d 857, 861 (Tex. 2000).  If no ambiguity exists, disagreement over interpretation of the contract will not make it ambiguous. 
 Gutierrez
,
 
139 S.W.3d at 776.

The initial determination of ambiguity is a legal question to be considered by the trial court, 
Lopez
, 22 S.W.3d at 861, and is made by looking at the contract as a whole in light of the circumstances present when the parties entered into the contract.  
Columbia Gas Transmission Corp. v. New Ulm Gas Ltd.
,
 
940 S.W.2d 587, 591 (Tex. 1996)
.  
In construing a contract, a court’s primary concern is to ascertain and give effect to the intent of the parties as expressed in the contract.  
Lopez
, 22 S.W.3d at 861
.  
Further, if a contract is susceptible of two interpretations, one rendering it valid and one invalid, construction validating it must prevail, and a reasonable interpretation will be preferred to an unreasonable one.
  Vincent v. Bank of Am.
,
 N.A.
, 109 S.W.3d 856, 867 (Tex. App.—Dallas 2003, pet. denied).  And, as would be expected, contractual language is construed in accordance with the plain meaning of the language, unless it definitely appears from the writing as a whole that the intention of the parties would be defeated by such a procedure. 
 McEwin v. Allstate Tex. Lloyds
, 118 S.W.3d 811, 815 (Tex. App.—Amarillo 2003, no pet.).

V.  Application

Neither party appears to have urged ambiguity at the trial court level.  Nevertheless, this does not constrain our review of this issue. 
 See
 
J.M. Davidson
,
 
128 S.W.3d at 231.  Our determination of the issue of ambiguity must precede the other issue because a finding of ambiguity would preclude the ultimate initial relief sought by BNSF—construction of the phrase in question in its favor as a matter of law.  BNSF opines that “perhaps the contractual provision at issue here is not a model of clarity.”  Indeed!  Perhaps if Jonah had stayed out of the water, he would not have been swallowed.

Applying the foregoing contractual construction principles, we conclude that the phrase in dispute is ambiguous, being patently unclear and yet capable of two reasonable interpretations.  A literal reading of the phrase, “Contractor guarantees that 
BNSF total Contractor actual charges 
will be at least 25%,” reveals that it is, at best, confusing.  Should “BNSF” be read as a possessive, “BNSF’s,” referring to the total Contractor actual charges of BNSF?  Or should “Contractor” be in the possessive, “Contractor’s,” meaning the actual charges of Skytrack?  Because the actual words used are not in the possessive case, do they intend to not refer to the language following them?  The next sentence in the contract uses the phrase “
Contractor total actual charges.
”  Is there a reason the word “total” has been moved?  What are “actual” charges?  What charges are not “actual”?  Further, and more important, there are two reasonable interpretations of the meaning of the phrase, as previously discussed and as urged by the parties.  Therefore, the trial court erred in finding the contract unambigous and granting judgment in favor of Skytrack.  BNSF’s first issue is overruled, and their second issue is sustained.  Because of our disposition of these issues, we do not reach Skytrack’s argument regarding election of remedies.  
See
 
Tex. R. App. P.
 47.1.

VI. Conclusion

Having found error in the judgment of the trial court, we remand this cause to the trial court for trial.

BOB MCCOY

JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  January 19, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P. 47.4
.