

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO.  2-08-236-CV

FORT WORTH TRANSPORTATION                                    APPELLANTS
AUTHORITY AND MCDONALD
TRANSIT, INC.

V.

RICKY C. THOMAS                                                       APPELLEE

------------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

**Introduction**

Appellants Fort Worth Transportation Authority (FWTA) and McDonald

Transit, Inc. appeal the trial court's order granting appellee Ricky C. Thomas's

motion for summary judgment in this breach of contract case.  In two issues,

appellants contend that the trial court improperly granted Thomas's summary

judgment motion because he failed to exhaust contractual remedies before filing

his lawsuit and because a collective bargaining agreement unambiguously permitted the termination of his employment. We affirm.

## Background Facts

### Thomas's employment with appellants

Thomas began working for appellants[1] as a bus driver in January 1989. He injured his back in 2001 and was unable to work for an extended period of time. Thomas requested and received twelve weeks' leave under the federal Family and Medical Leave Act (FMLA),[2] from July 13 through October 3, 2001. Appellants classified Thomas's absences on his Operator Work Record as "FMLA" from July 13 through October 3, 2001. One of appellants' employees wrote in an e-mail on October 3, 2001, that "[t]oday is the last day of FMLA for Ricky. Starting tomorrow, 10/4, he is just out sick." Appellants thereafter changed the classification of Thomas's absences on his Operator Work Record to "ill/sickness" beginning October 4, 2001.

---

[1] McDonald manages the public transportation bus system owned by FWTA, which is a political subdivision of the state. McDonald and FWTA do not argue on appeal that their liability should be considered separately. Thus, we refer to McDonald and FWTA, collectively, as appellants.

[2] *See* 29 U.S.C.A. §§ 2601–2654 (West 2009). The FMLA guarantees qualifying employees twelve weeks of unpaid leave each year for disabling health problems, family members' serious illnesses, or the birth of a new son or daughter; employers are prohibited from interfering with such leave. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 84–86, 122 S. Ct. 1155, 1158–60 (2002).

While he was unable to work, Thomas collected workers' compensation benefits and received a series of approximately seven injections as treatment for his back injury. Thomas was initially released to return to work in April 2002, but appellants did not allow him to return to work because he failed an April 16, 2002 performance evaluation.[3] In the interim, Thomas received a verbal warning, on April 5, and a written warning, on April 30, regarding his absences. The written warning stated, in part, "You now have 146 absences. Please keep in contact with the 'T' every two weeks."

Appellants terminated Thomas's employment by letter dated August 1, 2002. The letter cited a provision in a Union Contract Agreement[4] that required automatic termination for an absence from work lasting greater than one year when such an absence was caused by anything other than military leave.

Thomas filed a grievance with appellants on August 5, 2002, asking for reinstatement because he alleged that his performance evaluation was not required for all of appellants' employees. Appellants denied the grievance four days later. Thomas proceeded through two more unsuccessful steps in the

---

[3] Thomas again failed a performance evaluation in June 2002.

[4] The parties refer to this agreement as a collective bargaining agreement, and we will refer to the agreement as the "CBA" in this opinion.

3

grievance process,[5] and the union did not thereafter pursue arbitration on his behalf.

**The CBA and the Operator Handbook**

Effective October 1, 2000, appellants entered into the CBA with Teamsters Local Union No. 997.[6]  The provision in Article 20 under which appellants terminated Thomas's employment states in relevant part:  "the following shall be cause for immediate dismissal without prior warnings: . . . being on light duty status and/or absence [sic] from work for any reason other than military leave for a period of more than one (1) year."[7]

Appellants also issued employees an Operator Handbook, effective July 2001.  The Operator Handbook included, among other things, appellants' FMLA and attendance control policies.  Concerning FMLA leave, the Operator Handbook stated:  "The T complies with the Family and Medical Leave Act

---

[5]⬆ During the grievance process, appellants gave Thomas another opportunity to pass the performance evaluation and be reinstated.  It is unclear from the record whether Thomas accepted appellants' offer to retake the performance evaluation.

[6]⬆ Thomas affirmed during deposition testimony that he was a member of this union; he also filed an affidavit stating that he was "covered by the [CBA]."

[7]⬆ Appellants have maintained throughout the proceedings in the trial court and on appeal that this provision of the CBA was the sole basis of the termination of Thomas's employment.

4

(FMLA) for serious health problems" and that "[a]s with holidays, vacation leave, personal days, funeral leave and jury duty, FMLA is not counted as absenteeism." The attendance control policy in the Operator Handbook stated that it should be "constructed [sic] in accordance with" the CBA and outlined a progressive disciplinary process for excessive absenteeism. The Operator Handbook also specifically defined "absence" under its attendance control policy:

Definition of "Absence"

The term "absence" means every absence from work, regardless of the reason, except for the following:

1.   vacations
2.   holidays
3.   floating holiday
4.   jury duty
5.   court appearance as defined in Article 37 of the labor agreement
6.   military leave
7.   approved union business
8.   approved bereavement
9.   approved administrative leave
10.  leave of absence approved under Article 19
11.  *absences protected by the Family and Medical Leave Act of 1993*
12.  absent from assigned work for no more than sixty (60) minutes [Emphasis added.]

**The proceedings in the trial court**

Thomas filed suit against appellants in January 2003, alleging in his original petition that they violated Texas labor laws when they terminated his

5

employment.  Thomas filed a second amended petition in August 2006 that included a breach of contract claim and claims of retaliation and discrimination under the labor code.[8]

Thomas filed a motion for summary judgment in November 2007, contending that appellants breached the CBA.[9]  Thomas argued that because the Operator Handbook's definition of "absence" excluded FMLA leave, he was actually "absent" for less than one year; appellants therefore breached the CBA by terminating his employment when they did.  Appellants responded to Thomas's summary judgment motion by asserting that his contractual claim was precluded because he did not seek arbitration before bringing suit, that the Operator Handbook could not be treated as a contract, and that the CBA justified his termination.  The trial court granted Thomas's summary judgment motion in January 2008.  Thomas then nonsuited his other claims, and appellants timely filed their notice of appeal.

---

[8] Thomas's only pleaded theory of recovery at this time is his theory that appellants breached the terms of the CBA.  Thomas nonsuited all of his other claims.

[9] Thomas also sought summary judgment on his discrimination claim, but the trial court denied the motion as to that claim.  Thomas does not challenge that ruling in this appeal.

**Standard of Review**

We review the trial court's grant of summary judgment de novo. *See Gray v. Nash*, 259 S.W.3d 286, 289 (Tex. App.—Fort Worth 2008, pet. denied). A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). In other words, the plaintiff meets the summary judgment burden by establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

When reviewing the trial court's grant of a plaintiff's summary judgment motion, we take as true all evidence favorable to the defendant, and we indulge every reasonable inference and resolve any doubts in the defendant's favor. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Evidence that favors the plaintiff's position will not be considered unless it is uncontroverted. *See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965). However, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc.*

7

*v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005). Summary judgment is proper where, as here, the parties do not dispute the relevant facts. *Havlen v. MacDougall*, 22 S.W.3d 343, 345 (Tex. 2000).

### Exhaustion of Contractual Remedies

In their first issue, appellants contend that the trial court's summary judgment was improper because Thomas waived his breach of contract claim by failing to fully comply with the CBA's grievance procedure. Specifically, appellants assert that Thomas failed to pursue arbitration after the three-step grievance procedure, thus waiving his breach of contract claim. Thomas contends, in response, that the CBA specifically exempts "management rights" from mandatory arbitration and that the decision to terminate Thomas's employment was one of the "management rights."[10]

"Where there is a labor contract between a union and an employee which provides procedures for settlement of disputes between the employee and employer, an employee is not entitled to redress in the courts where he fails to

---

[10] Appellants contended in their reply brief and at oral argument that Thomas failed to assert the "Management Rights" exclusion from the arbitration requirement in the trial court and that this exclusion cannot be raised for the first time on appeal. We disagree. The record indicates that Thomas raised the "Management Rights" issue in his reply to appellants' response and objections to his amended summary judgment motion.

exhaust his remedies under the contract." *Lindsey v. Gen. Dynamics Corp.*, 450 S.W.2d 895, 895–96 (Tex. Civ. App.—Waco 1970, no writ); *see Int'l Union United Auto. Aerospace & Agric. Implement Workers of Am. Local 119 v. Johnson Controls, Inc.*, 813 S.W.2d 558, 565 (Tex. App.—Dallas 1991, writ denied) (op. on reh'g) (indicating that claims may be barred because of a plaintiff's failure to comply with the grievance process in a collective bargaining agreement); *Roberts v. City of Corpus Christi*, 744 S.W.2d 214, 215–16 (Tex. App.—Corpus Christi 1987, no writ) ("[A]n employee generally must exhaust the grievance remedies provided for in a collective bargaining agreement or other contract before bringing suit."). Here, Article 12 of the CBA indicates that "any controversy" concerning the application of any of the CBA's provisions "shall be treated as a grievance and shall be settled, if possible." Appellants relied on a provision of the CBA to justify Thomas's termination, and Thomas has contested the application of this section; thus, his complaints were subject to the CBA's grievance procedure.

The parties agree that Thomas proceeded through the three steps of the CBA's grievance process described above. They also agree that the union did not demand arbitration following the three-step grievance process. Thomas asserts, however, that his discharge was not subject to arbitration under the CBA. We agree.

9

Article 13 (titled "Arbitration"), Section A of the CBA provides: "Should any grievance remain unsettled after exhausting [the three-step grievance procedure], either party hereto shall, if the party desires, demand arbitration . . . . Otherwise, the grievance shall be considered settled." However, Article 13, Section C of the CBA states in part, "Issues arising out of the exercise of the rights reserved to management under the title Rights of Management above, including management's determination of the facts underlying its exercise of such rights, shall not be subject to arbitration." Article 3 of the CBA, titled "Management Rights,"[11] states,

> Except to the extent expressly abridged by a specific provision of [the CBA], the Company reserves and retains, solely and exclusively, all of its Common Law rights to manage its business, as such rights existed prior to the execution of [the CBA]. *Prominent among such unqualified rights . . . are the following*: . . . to hire, lay-off, assign, transfer, and promote employees . . .[;] to adopt and enforce working rules; *to discipline and discharge employees for just cause*.[12]  [Emphasis added.]

We conclude that the unambiguous cumulative effect of Article 13, Section C and Article 3 is that appellants' "unqualified" decision to discharge Thomas based on what they allege was just cause under the CBA was not

---

[11] While there is no provision of the CBA titled "Rights of Management" as denoted by Article 13, Section C, we conclude that Article 3, pertaining to "Management Rights," is the title to which Article 13, Section C refers.

[12] Appellants have not asserted that any provision of the CBA expressly abridged its "management right" to discharge Thomas's employment.

10

subject to arbitration because this decision was one of their "Management Rights."  Therefore, we hold that Thomas complied with the Article 12 grievance procedure, although not successfully demanding arbitration, by proceeding through all three grievance steps and that the CBA did not require Thomas to also seek arbitration.[13]  We overrule appellants' first issue.

### Thomas's Discharge Under the CBA and the Operator Handbook

In their second issue, appellants argue that the trial court improperly granted summary judgment because the Operator Handbook should not have been considered to alter the CBA's unambiguous language.  Thomas argues that the definition of "absence" in the Operator Handbook, which excludes FMLA leave from an "absence," must be considered with Article 20 of the CBA because the CBA does not define "absence."[14]  Neither party argues that the

---

[13] Thomas also contends that appellants forfeited any right to arbitration by violating the grievance procedure and by their litigation conduct and that any failure to arbitrate was harmless error.  Because we conclude that the arbitration requirement did not apply to Thomas's discharge, we do not address these other assertions.

[14] Thomas also argues on appeal that his FMLA leave cannot be counted as an "absence" under Article 20 because doing so violates the FMLA. Because "[t]he assertion of new grounds before the appellate court in support of summary judgment may prejudice the nonmovant's ability to demonstrate that the issue raises a genuine issue of material fact," we cannot affirm a summary judgment "on grounds not expressly set out in the motion or response." *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993). Thomas did not include this argument in his amended motion for summary

11

CBA is ambiguous. Instead, they offer competing contentions as to whether the definition of "absence" in the Operator Handbook may be considered when interpreting Article 20 of the CBA.

Lack of clarity or a disagreement among the parties does not necessarily create an ambiguity. *See Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). Rather, whether "a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Id.*

When construing contracts and other written instruments, our primary concern is to ascertain the true intent of the parties as expressed in the instrument. *See NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Fort Worth 2007, no pet.); *see also City of San Antonio v. Scott*, 16 S.W.3d 372, 377 (Tex. App.—San Antonio 1999, pet. denied) (applying general principles of contract construction to the interpretation of a

---

judgment or in any other document filed with the trial court. Thomas cited the applicable federal regulation, 29 C.F.R. § 825.220 (2009), in his reply to appellants' response and objections to his first amended motion for summary judgment, but only for the proposition that he was not required to arbitrate his claim against appellants. We are therefore prohibited from affirming the summary judgment on this ground. *See Stiles*, 867 S.W.2d at 26; *Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 786 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

collective bargaining agreement). To ascertain the parties' intent, we may consider together all writings relating to the same transaction, even if they were executed at different times. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999). We must examine and consider the entire contract in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *Potter*, 230 S.W.3d at 463; *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L & F Dist., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987)). "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law." *Id.* (citing *Webster*, 128 S.W.3d at 229).

To resolve appellants' second issue, we must determine whether the parties intended to exempt FMLA leave from a one-year absence under Article 20 of the CBA. The provision at issue permits termination of employment for an absence exceeding one year and specifically exempts military leave; it does not expressly reference FMLA leave. In fact, the CBA does not define

13

"absence" and does not set forth appellants' FMLA policy. Appellants' FMLA policy and a definition of "absence" are instead contained in the Operator Handbook.[15] The question, then, is whether the Operator Handbook should be considered with the CBA to determine if Thomas's "absence" exceeded one year.

"Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another." *Parks*, 1 S.W.3d at 102. The CBA became effective October 1, 2000, and the Operator Handbook is dated July 2001, so they were not contemporaneously executed. They may nevertheless be considered together if they relate to the same transaction and the surrounding circumstances do not indicate that they should not be considered together. *Id.*; *see also Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959).

The CBA set forth the agreements between appellants and the union with regard to the terms and conditions of employment for the union's members.

---

[15] Federal law requires appellants to include their FMLA policies in the Operator Handbook. *See* 29 C.F.R. § 825.300(a)(1), (3) (West 2009) (requiring FMLA-covered employers to provide its eligible employees with a notice explaining the provisions of the FMLA and to "includ[e] the notice in employee handbooks . . . if such written materials exist").

14

It addressed, among other things, rights reserved to management, strikes and lockouts, uniforms, work schedules, discipline, termination for "just cause," and grievance procedures. The Operator Handbook similarly set forth appellants' personnel policies, generally with more specificity than the CBA, and included policies relating to employee benefits, health and safety, FMLA leave, and absenteeism. The Operator Handbook referenced the CBA, and its attendance control policy provided that it was to be "constructed [sic] in accordance with" the CBA. Under the circumstances of this case, the CBA and the Operator Handbook related to the same transaction because they set forth the terms and conditions of Thomas's employment with appellants.

We must next consider whether the surrounding circumstances prevent the CBA and the Operator Handbook from being considered together. In this regard, the CBA stated in Article 42: "This Agreement together with its Exhibits constitutes the only agreement between the parties hereto, and no *previous* addenda, memoranda[,] understandings or practices, whether written or oral, shall be binding upon either party."[16] [Emphasis added.] The CBA did not,

---

[16] This type of contractual provision is commonly referred to as a "merger clause." "Merger occurs when the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter." *Texas A&M Univ.–Kingsville v. Lawson*, 127 S.W.3d 866, 872 (Tex. App.—Austin 2004, pet. denied). This merger clause does not prevent consideration of the Operator Handbook because the CBA pre-dates the Operator Handbook.

however, state that *subsequent* documents, such as the Operator Handbook, cannot be considered with the CBA. The Operator Handbook, on the other hand, stated that its attendance control program was "intended to be and should be constructed [sic] in accordance with" the CBA and any successor CBAs. The Operator Handbook also stated, however, that "[i]t is not an employment contract," that it "is not intended to create contractual obligations of any kind," and that it is "not intended to disagree in word or intent with the current Labor Agreement." Even though the Operator Handbook does not purport to create contractual rights, we find that we may consider its terms in determining whether the parties intended to exempt FMLA leave from the provision in Article 20 under which appellants terminated Thomas's employment. The CBA and the Operator Handbook related to the same transaction, and their terms do not clearly prevent them from being considered together. *See Parks*, 1 S.W.3d at 102; *Miles*, 321 S.W.2d at 65. Thus, we will consider the CBA and Operator Handbook together to determine the parties' intent with respect to FMLA leave and absences exceeding one year.[17]

---

[17] Our precedent establishes that as a general rule, employee handbooks and policy manuals constitute general guidelines in the employment relationship and do not create implied contracts between the employer and employee that alter the at-will employment relationship. *Brown v. Sabre, Inc.*, 173 S.W.3d 581, 585 (Tex. App.—Fort Worth 2005, no pet.). Our decision today does not conflict with *Brown*. Thomas was not an at-will employee; the CBA governed

Appellants terminated Thomas's employment under the provision in Article 20 that states: "the  following shall be cause for immediate dismissal without prior warnings: . . . being on light duty status and/or absence [sic] from work for any reason other than military leave for a period of more than one (1) year."  The provision does not expressly exempt FMLA leave from an absence justifying termination.[18]  However, the Operator Handbook states: "The T complies with the Family and Medical Leave Act (FMLA) for serious health problems."  The Operator Handbook also provides that "[a]s with holidays, vacation leave, personal days, funeral leave and jury duty, *FMLA is not counted as absenteeism*."  [Emphasis added.]  The Operator Handbook further defines "absence" as "every absence from work, regardless of the reason, except for the following: . . . (11) absences protected by the Family and Medical Leave Act of 1993."[19]  Considering the CBA and the Operator Handbook together, we

---

the terms and conditions of his employment with appellants.  And, contrary to the dissent's characterization of our holding, we do not say that the Operator Handbook created contractual rights.  We consider the CBA with the Operator Handbook only to determine the intent of the parties concerning FMLA leave in the context of Article 20 of the CBA.

[18] This provision also does not exempt bereavement leave from an absence justifying termination, but we note that Article 36 of the CBA provides: "Employees taking approved bereavement leave shall not be charged with an absence."

[19] There is no dispute in this case that Thomas was in fact eligible for leave under appellants' FMLA policy as stated in the Operator Handbook.

17

conclude that FMLA leave cannot be counted as an "absence" under Article 20 of the CBA when terminating an employee for an absence exceeding one year.[20]

Based on the foregoing, we hold that Article 20 of the CBA must be interpreted to exclude FMLA leave when calculating whether Thomas was absent from work for more than one year. The summary judgment evidence establishes that Thomas first missed work on July 13, 2001, when his FMLA leave began, and that his FMLA leave ended on October 3, 2001. The summary judgment evidence also establishes that appellants terminated Thomas's employment on August 1, 2002. Excluding Thomas's FMLA leave, Thomas was actually "absent" from work for less than one year when appellants terminated his employment on August 1, 2002. Appellants therefore breached the CBA by terminating Thomas's employment when they did. The trial court properly granted summary judgment to Thomas on his breach of contract claim. We overrule appellants' second issue.

---

[20] Although "a court may conclude that a contract is ambiguous even in the absence of such a pleading by either party," *McCreary v. Bay Area Bank & Trust*, 68 S.W.3d 727, 730–31 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd), we do not find that the CBA is ambiguous. Instead, after applying the pertinent rules of construction and considering the CBA and the Operator Handbook together, we find that the provision in Article 20 under which Thomas was terminated is susceptible to only one reasonable interpretation: FMLA leave cannot be counted as an absence when terminating an employee for an absence exceeding one year.

## Conclusion

Having overruled each of appellants' issues, we affirm the judgment of the trial court.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

LIVINGSTON, J. filed a dissenting opinion.

DELIVERED:  October 29, 2009



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-236-CV

FORT WORTH TRANSPORTATION                                    APPELLANTS
AUTHORITY AND MCDONALD
TRANSIT, INC.

V.

RICKY C. THOMAS                                                APPELLEE

------------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

------------

## DISSENTING OPINION

------------

The majority holds that a unilateral, nonbargained employee handbook may create contractual rights (thus serving as the basis of a breach of contract claim) and alter the unambiguous language of a collective bargaining agreement (CBA) even though the handbook specifically and plainly says that it cannot do so. For this and other reasons, I respectfully dissent.

The CBA unambiguously required the immediate termination of Thomas's employment if he was absent "from work *for any reason other than military leave* for a period of more than one (1) year." [Emphasis added.] The undisputed evidence shows that Thomas did not work from July 2001 until August 2002 (a period of more than one year) and that he did not take military leave. Despite the evident justification for Thomas's termination when connecting those facts, the majority holds that Thomas may succeed on his sole claim—which must focus on a breach *of the CBA itself*, the only agreement between the parties—because his twelve weeks' leave under the federal Family and Medical Leave Act (FMLA) must expand the one-year absence limitation. *See* Majority op. at 18.[21] The record and the law preclude the majority's holding for several reasons.

First, although the majority correctly explains that in some circumstances documents related to the same transaction may be considered together, we should not rely on that manner of construction when the documents themselves prohibit such reliance. *See Jones v. Kelley*, 614 S.W.2d 95, 99 (Tex. 1981)

---

[21] As the majority explains, Thomas relies on portions of the handbook that state that FMLA leave is "not counted as absenteeism" and exclude FMLA leave from the handbook's definition of "absence." Majority op. at 18. Those portions of the handbook are relevant to the handbook's Attendance Control Program, which sets forth increasing disciplinary actions for employees accumulating several absences during a rolling twelve-month period. The program does not explicitly relate to absences lasting longer than one year, as does the CBA.

2

(explaining that the principle of construing writings together is a "device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation") (quoting *Miles v. Martin*, 159 Tex. 336, 341, 321 S.W.2d 62, 65 (1959)).

Here, the handbook indicates that it does not enlarge collectively-bargained provisions; its first textual page states that it is

> intended to provide employees with a general understanding of [appellants'] personnel policies. Employees are encouraged to familiarize themselves with the contents of the handbook, as it will answer many common questions concerning employment with [appellants].
>
> However, this handbook cannot anticipate every situation or answer every question about employment. *It is not an employment contract and it is not intended to create contractual obligations of any kind*. . . .
>
> . . . *These policies and/or benefits are not intended to disagree in word or intent with the current Labor Agreement*. [Emphasis added.]

Other parts of the CBA and the handbook also weigh against the majority's conflated construction of those two documents. For instance, while the CBA references work rules and rule books, it limits an employee's duty to follow such provisions to "rules and regulations of [appellants] which are not in conflict with [the CBA]," which dictates the superiority of the CBA's provisions. Also, the CBA's reference to such rules does not provide that any definitions from the rules should be incorporated into the CBA's provisions. The CBA

3

further states that it is the "only agreement between the parties." Finally, although the handbook indicates that it is to be construed in accordance with the CBA in use at the time of Thomas's termination, it does not state the inverse—that the CBA is to be construed in accordance with the handbook.

Second, as the majority recognizes, our precedent establishes that as a general rule, employee handbooks and policy manuals constitute general guidelines in the employment relationship and do not create implied contracts between the employer and employee that alter the at-will employment relationship. Majority op. at 16; *see Brown v. Sabre, Inc.*, 173 S.W.3d 581, 585 (Tex. App.—Fort Worth 2005, no pet.) (describing that the rule particularly applies where, as here, "a specific disclaimer in the employee handbook warns the employee that the manual is intended to provide guidelines only, and does not create contractual rights"); *see also Fed. Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993); *Day & Zimmermann, Inc. v. Hatridge*, 831 S.W.2d 65, 69 (Tex. App.—Texarkana 1992, writ denied) (explaining that "[u]nder Texas law . . . a statement of company policy, unaccompanied by an express agreement, does not create contractual rights"). In the same way, although Thomas's employment was not at-will, the handbook should not be construed to alter the provisions of the collectively-bargained contract on which Thomas bases his claim without an expressed intention to do so. The majority has failed to explain why the precept that guided our decision in *Brown*, that

4

unilateral employment manuals cannot per se constitute written employment contracts, should not also apply to the ability of such manuals to alter preexisting contractual employment relationships. *See Brown*, 173 S.W.3d at 586 (citing *Aiello v. United Air Lines, Inc.*, 818 F.2d 1196, 1198 (5th Cir. 1987)).

Third, Thomas's argument that the handbook's "absence" definition should be incorporated into the CBA to excuse FMLA leave does not make sense when considering the CBA's specific and limited designation of military leave as an excused absence because military leave is also excluded as an absence in the handbook. In other words, if appellants and Thomas's union had intended to add FMLA leave to an "absence" lasting greater than one year in the CBA by tacitly incorporating the handbook's definitional provision, there would be no need to specifically mention military leave in the CBA, which is also excluded in that same definitional provision. If that had been their intent, the specific mention of military leave in the CBA's termination provision would amount to unnecessary surplusage. And, of course, by the majority's decision that indicates its opinion of the contracting parties' intent to tacitly incorporate the handbook into the CBA, the "for any reason other than military leave" phrase in the CBA's termination provision is rendered wholly inconsequential.

Thus, the majority's decision to alter the CBA's language by the handbook's provisions defeats its stated goal of giving effect to "all provisions

5

so that none are rendered meaningless." Majority op. at 13; *see NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Fort Worth 2007, no pet.). For the same reason, the decision also weighs against the entitlement of parties to a contract to select their own obligations—rather than having a court create obligations for them—by carefully choosing the words they select to include in the contract.[22] *See Doe v. Tex. Ass'n of Sch. Bds., Inc.*, 283 S.W.3d 451, 458 (Tex. App.—Fort Worth 2009, pet. filed) (citing *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.)).

Fourth, the majority's decision that the handbook adds an employee's FMLA leave to the one-year limitation in the CBA makes even less sense when considering the other types of leave that are mentioned in the handbook and are also necessarily added to the one-year period under the majority's reasoning, such as holidays and vacations. The CBA provides appellants' employees with eleven holidays. Because Thomas had been employed by appellants for more than nine years, he also received three weeks' paid vacation. Thus, under the majority's reasoning, when considering Thomas's twelve weeks of FMLA leave,

---

[22] In accordance with that entitlement, the CBA expresses that in crafting that document, Thomas's union and appellants each "had the unlimited right and opportunity to make demands and proposals with respect to all proper subjects of collective bargaining and that all such subjects [had] been discussed and negotiated upon and the agreements contained in this contract [had been arrived upon] after the free exercise of such rights and responsibilities."

6

his more than two work weeks of combined holidays, and his three weeks of vacation, appellants could not have terminated Thomas's employment until more than seventeen weeks (about four months), at a minimum, had passed after he had already been unable to work for a year. Appellants would then have to further add to that time any days off related to his jury duty, bereavement or administrative leave, or "approved union business." As can be seen, the majority's decision has turned a simple phrase—"absence from work for any reason other than military leave for a period of more than one (1) year"—into a mathematical enigma that could justify Thomas's absence from work for close to a year and a half.

Finally, the majority's holding that the handbook adds to the CBA's contractual language becomes further strained when considering that in the handbook, appellants "reserve[d] the right to change, revise, or eliminate any of the [handbook's] policies." Under the majority's reasoning, although FMLA leave must be added to the CBA's one-year limitation today, it may not be added to that limitation tomorrow if appellants choose to modify the handbook. Such fluidity is obviously at odds with our task of interpreting the parties' *contractual bargain*. *See Gamble v. Gregg County*, 932 S.W.2d 253, 255 (Tex. App.—Texarkana 1996, no writ) (indicating that an employee handbook does not express an intent to vest contractual rights when it "expressly provides that the [employer] may unilaterally change the policies and practices"); *Ryan v.*

7

*Superior Oil Co.*, 813 S.W.2d 594, 596 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (holding that a vacation plan that stated that it could "be terminated or modified at any time" did not create a contractual obligation).

For all of these reasons, the handbook, as a matter of law, cannot enlarge or modify the CBA's provisions, and it cannot serve as the basis for Thomas's breach of contract claim.  And even if the handbook's provisions created doubt on interpreting the CBA's termination language, the majority should have resolved those doubts in appellants' favor.  *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004).

Because the trial court improperly granted summary judgment on Thomas's claim for breach of the CBA, I would sustain appellants' second issue and reverse this case.  Because the majority affirms the trial court, I respectfully dissent.

TERRIE LIVINGSTON
JUSTICE

DELIVERED:  October 29, 2009

8