

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00199-CV

---

TRI-COUNTY ELECTRIC
COOPERATIVE, INC.

APPELLANT

V.

GTE SOUTHWEST
INCORPORATED D/B/A VERIZON
SOUTHWEST

APPELLEE

----------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY
TRIAL COURT NO. CV10-1865

----------

## OPINION

----------

This is an appeal from a summary judgment in favor of GTE Southwest Incorporated d/b/a Verizon Southwest (Verizon) in a dispute involving the proper construction of provisions in an industry-standard agreement between Verizon and Tri-County Electric Cooperative, Inc. (Tri-County) governing the joint use of each other's utility poles. In three issues, Tri-County, the plaintiff in the

underlying suit, challenges the visiting trial judge's summary judgment for Verizon based on Verizon's construction of the terms of the agreement and the award of attorney's fees to Verizon. We reverse and render in part, reverse and remand in part, and affirm in part.

## I. Background

Tri-County is an electric cooperative that has provided electricity in Parker County and other Texas counties for over seventy years. In December 1959, Tri-County entered into a "General Agreement Joint Use of Wood Poles" with Southwestern States Telephone Company of Brownwood, Texas for the "joint use of their respective poles, erected or to be erected within the areas in which both parties render service." The agreement set forth an initial annual rental rate to be paid for the use of the joint poles and also provided for periodic adjustment of the rental rates at five-year intervals upon the request of either party. Tri-County executed four amendments to this agreement; in three of the amendments, the amount of the rentals was increased. The last rental adjustment occurred in 1993. Verizon, which provides telecommunications services in the same geographic area as Tri-County provides electricity, is the successor to Southwestern States through a series of mergers and corporate transactions.

In 1975, Tri-County entered into the same type of agreement with Continental Telephone Company of Texas. That agreement also provided for the periodic adjustment of rentals. In 1981, Tri-County and Continental agreed to an

2

amendment of the contract that increased the pole rental rates; no further rental adjustment or other amendment to that agreement has been made. Verizon is also the successor to Continental. Both agreements, as amended, are collectively referred to herein as the JUA.

In a November 6, 2003 letter to Verizon, Tri-County requested a rental rate adjustment "pursuant to Article XII," stating that "[t]he new rates will be effective January 1, 2004." The letter concludes as follows:

> Appendix B of the agreements provides a method (Share The Savings Method) to determine rental rates based upon pole costs and operational costs. Please coordinate evaluation of these costs with Ed Sheppard of RASR Associates. RASR Associates has been retained by Tri-County . . . to assist in developing joint use rental rates. . . . We will need Verizon's costs for 30 foot poles and Verizon's annual charge percentage relating to poles to make this calculation.

Verizon did not respond to the request for cost information, but Tri-County continued to bill, and Verizon continued to pay, rental at the 1981 and 1993 amended rates. In January 2005, Tri-County notified Verizon by letter that it was terminating the JUA under article XX effective February 2, 2008. In that letter, Tri-County demanded that Verizon remove its attachments from Tri-County poles by the termination date and also asserted, "Verizon has not cooperated in providing cost information as requested by letter dated November 6, 2003. Based on information filed by Verizon with the FCC and Tri-County Electric costs, the rental rate will be $31.17/pole for the remaining three (3) years of the Agreement." According to Tri-County, the $31.17 rate was a clerical error, and it

3

told Verizon later that the rate should be $29.21 instead. Beginning in 2009, Tri-County began billing Verizon at the $29.21 per pole rate because Verizon's attachments remained on Tri-County's poles and were being used by Verizon; Verizon has not paid pole rental since the termination date.[1]

In late 2009 or early 2010, Tri-County realized that Verizon had not been seeking permits for new attachments to Tri-County's poles for some time; thus, Tri-County engaged a third-party consultant to inventory its poles. According to Tri-County, from 2004 to 2010 its records had shown that Verizon had 5,307 attachments to Tri-County's poles, but the inventory showed that Verizon had approximately 7,523 attachments to Tri-County's poles.

In October 2010, Tri-County sued Verizon (1) for breach of contract for failing to pay rental to Tri-County for its attachments to Tri-County's poles for the years 2008, 2009, and 2010[2] and (2) breach of contract, trespass, and trespass to try title for failing to remove its attachments from Tri-County's poles after the termination date of the JUA. Tri-County also sought a declaratory judgment that Verizon had breached the JUA, that Tri-County had properly terminated the JUA,

---

[1]In late 2009, Verizon tendered payment to Tri-County of $11.80 per pole, but Tri-County returned the check because it was not in full satisfaction of Tri-County's rental demand. Tri-County also sought additional rental for 2005–2007, but it has not challenged the summary judgment as to its claim for rental for those years.

[2]Per the JUA, the 2010 rental would not be billed until 2011.

4

that Verizon must remove its attachments from Tri-County's poles, and that Tri-County is entitled to the 2008–2009 rental it was seeking.

Tri-County amended its petition twice; its second amended petition expanded its breach of contract allegations to include Verizon's alleged failure to obtain Tri-County's prior permission when making additional attachments to poles and sought breach of contract damages and declaratory relief for unpaid rentals from 2005 "to the present."[3] Additionally, Tri-County also sought to enjoin Verizon from adding future attachments to its poles.

Verizon filed a motion for summary judgment on all of Tri-County's claims, and Tri-County filed a motion for partial summary judgment. At a hearing on the motions in November 2013, the visiting trial judge verbally granted Verizon's summary judgment motion. When the judge indicated that he would consider granting Verizon attorney's fees, Tri-County's counsel argued that Verizon had not pled for attorney's fees in its answer even though it had requested attorney's fees in its motion for summary judgment. Verizon filed a motion for leave to amend its answer to include a request for attorney's fees and to amend its motion for summary judgment to present evidence of reasonable and necessary attorney's fees. The trial court granted Verizon's motion for leave to amend both pleadings. Additionally, the trial court signed an order denying Tri-County's

---

[3]Although Tri-County originally premised its breach of contract claim on Verizon's alleged failure to pay the rental rate Tri-County had demanded in its November 2003 letter, its second amended petition alleged that Verizon had failed to pay "an appropriate rental rate."

5

motion for partial summary judgment, and a final, take-nothing judgment for Verizon, awarding it $1,100,000 in attorney's fees for proceedings in the trial court and $150,000 in attorney's fees in the event of an unsuccessful appeal by Tri-County.

## II.     Issues on Appeal

In its first issue, with four subissues, Tri-County challenges the trial court's granting the summary judgment for Verizon and denying the partial summary judgment motion filed by Tri-County.  In its subissues, Tri-County contends as follows:  (1) it validly terminated the JUA, which required Verizon to remove all its attachments to Tri-County's poles as of the termination date, (2) there is at least a fact issue as to whether Verizon is a holdover tenant, (3) Verizon has breached the JUA because it (a) has not paid rental since the termination date although it maintains and continues to use attachments on Tri-County's poles, (b) at least a fact issue exists as to Verizon's failure to report new attachments to Tri-County's poles, (c) Verizon failed to provide cost and charge information in good faith in response to Tri-County's 2003 request, and (4) there is some evidence to support an award of exemplary damages.  In its second issue, Tri-County contends that the trial court abused its discretion by granting Verizon leave to amend its pleadings to include a request for an award of attorney's fees and that the trial court abused its discretion by overruling Tri-County's objections to

6

Verizon's summary judgment evidence of fees.[4]  Finally, in its third issue, Tri-County contends that if this court reverses the take-nothing summary judgment, it must also reverse the award of attorney's fees to Verizon and the take-nothing summary judgment on attorney's fees sought by Tri-County.

### III.    Propriety of Summary Judgment Rulings

### A.    Standard of Review

We review a summary judgment de novo.  *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).  A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.  *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

Generally, when both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review

---

[4]Tri-County has not challenged whether the attorney's fees were reasonable and necessary, equitable and just, properly segregated, or whether the *Arthur Andersen* elements were satisfied.  *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (op. on reh'g).

7

both parties' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *Mann Frankfort*, 289 S.W.3d at 848; *see Myrad Props., Inc. v. Lasalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009). But because Tri-County moved only for a partial summary judgment, we may render only as to those matters that Tri-County raised in common with Verizon. *See CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568, 569 (Tex. 1998); *Bowman v. Lumberton ISD*, 801 S.W.2d 883, 889 (Tex. 1990) (op. on reh'g).

## B.    Allegations in Second Amended Petition

Tri-County alleged that after it terminated the JUA, Verizon failed to remove its attachments from Tri-County's poles; Tri-County contends this failure to remove constituted a wrongful holdover. Tri-County also alleged that in investigating the conflict, it discovered that Verizon had placed additional attachments on the poles without prior permission as required by the JUA. According to Tri-County, this discovery prompted it to engage an outside contractor to inventory all of the attachments on its poles.

Consequently, Tri-County alleged that Verizon had breached the JUA by failing to provide correct information regarding the extent of its attachments to Tri-County's poles, as required to calculate the applicable rental rate, and by adding additional attachments to its poles without prior permission. Tri-County also sought unpaid rental from 2005 through the date of judgment, a declaratory judgment defining the rights, powers, and privileges of Verizon "with regard to the

8

use of [Tri-County] facilities, and specifically . . . an order directing Verizon to remove its attachments and to cease and desist from further use of any poles" belonging to Tri-County. Tri-County further sought to recover the cost of the inventory. Alternatively, Tri-County sought damages and injunctive relief for trespass and trespass to try title. Finally, Tri-County sought an award of exemplary damages and attorney's fees under section 37.009 and chapter 38 of the civil practice and remedies code.

## C.    Verizon's Motion for Summary Judgment

Verizon alleged, "In this case, the parties disagree over the frequency and manner in which the price *and* quantity terms may be adjusted under their JUA[]." Verizon argued that (1) it had not breached the JUA because the JUA "clearly and unambiguously require[s] payment of only rentals that are 'agreed upon,'" (2) Tri-County "cannot prove its trespass claims (Counts 2–3) because Verizon . . . has the right to remain on [Tri-County's] poles under the JUA and Texas law," (3) Tri-County "cannot show that the pole inventory was caused by allegedly 'wrongful acts' (Count 1) that were only discovered because of the inventory," and (4) because Tri-County cannot prevail on Counts 1–3, it also cannot recover attorney's fees, exemplary damages, and declaratory judgment relief in that, as pleaded, they are all dependent on its prevailing on Counts 1–3.

Verizon also contended that Tri-County could not recover for breach of contract because it could not show that it had complied with the JUA in that its attempt to impose new rentals was directly contrary to the plain language of the

9

JUA requiring the "mutual agreement of the parties" and that Tri-County's demands for increased rentals beginning in 2003 violated the JUA's provision prohibiting "rates from being adjusted more frequently than every five years."

Citing articles XI(a), XII, and Appendix B of the JUA, Verizon argued that the plain language of the JUA unambiguously provides that any new rentals must be "agreed upon" before they can be put in "the annual bill next rendered." Periodic increases are to be based on "joint review and adjustment" by agreement. According to Verizon, "[t]his plain language unambiguously requires agreement before rentals can be increased through either rate or pole count increases."

Regarding Tri-County's trespass claim, Verizon argued that Article XX of the JUA regarding termination and Article XIII, the default provision which is referenced in Article XX, are silent about the removal of attachments from Tri-County's poles; therefore, removal is not required upon termination. Verizon also argued that the JUA allows it to maintain existing attachments even after termination and that Tri-County had irrevocably elected to "treat [it] as a tenant, rather than a trespasser" by demanding rent, engaging in negotiations for a new JUA, suing for past due rent under the JUA, and by alleging in its petition that Verizon was a holdover tenant. Verizon contended that the termination provision in Article XX applies only to the future granting of additional joint use and that, therefore, all attachments made prior to termination are attachments existing on the date of termination.

Regarding the inventory, Verizon alleged factually that it had no notice or participation in the inventory process, that the inventory counted "poles to which Verizon . . . is not actually attached," that it counted "some poles twice," and that it assumed "ownership of all poles as [Tri-County] poles 'unless obvious in the field.'" It also contended Tri-County had not alleged any breach of the JUA that was a but-for cause of the inventory, that the JUA did not require Verizon to pay for such an inventory, and that there is no evidence that Verizon engaged in any wrongful acts necessitating the inventory (i.e., breach of contract). According to Verizon, "If the only evidence of the alleged wrongful acts is the results of the inventory, the inventory cannot, by definition, be the natural, probable, or foreseeable consequence of those allegedly wrongful acts."

Finally, Verizon alleged that Tri-County's pleaded relief for a declaratory judgment, exemplary damages, and attorney's fees all fail because they are dependent on Tri-County's recovering under the breach of contract or trespass causes of action. It also contended that Tri-County had produced no evidence of fraud, malice, or gross negligence sufficient to raise a fact issue on its entitlement to exemplary damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West 2015).

### 1. Tri-County's Response

In its response, Tri-County argued that the plain language of the JUA provides that rental rates are to be determined according to the formula set forth in Appendix B, the primary objective of which is an equitable sharing of costs.

Additionally, Tri-County contended that Article IV of the JUA requires Verizon to request permission before adding new attachments and that Article XX gave it an unconditional right to terminate the JUA upon three years' notice after the expiration of twenty-five years from the JUA's effective date. It further argued that it can recover damages for paying for the pole inventory because it would not have needed to do so absent Verizon's breaches in (1) failing to get written permission to attach additional attachments and (2) failing to pay rent for those attachments as required by the JUA.

Tri-County also responded that the motion as to its trespass claim is premature because it pled trespass as an alternative to breach of contract and because genuine issues of material fact exist. As part of this argument, Tri-County argued that Verizon is not entitled to keep its attachments on Tri-County's poles in perpetuity because Texas law disfavors perpetual leases.

### 2. Verizon's Reply

Verizon responded that there is no evidence that it refused to negotiate regarding rentals, that the evidence shows that it did negotiate and that agreements were made in past years, and that Tri-County is the one refusing to cooperate. Verizon also disputed Tri-County's argument that the "not less than 5 years" provision does not apply post-termination of the JUA because (1) it is not a holdover tenant and (2) that argument contradicts Tri-County's own argument that the JUA applies during a holdover.

**D. Tri-County's Motion for Partial Summary Judgment and Verizon's Response**

Tri-County reiterated the arguments from its response to Verizon's motion for summary judgment: (1) that its notice of termination effectively terminated the JUA, (2) that it had the right to require Verizon to remove its attachments from Tri-County's poles as of February 1, 2008, and (3) that Verizon is a holdover tenant. Tri-County also reiterated its argument that Appendix B to the JUA governs the calculation of rent. In its response, Verizon re-urged the arguments from its motion for summary judgment and also claimed that Tri-County's "counter-textual" interpretation of Appendix B would allow Tri-County to unilaterally impose a rental rate on Verizon.

**E. Principles of Contract Construction**

Our primary concern when construing a contract is to ascertain the true intent of the parties as expressed in the contract. *NP Anderson Cotton Exch.*, *L.P. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Fort Worth 2007, no pet.). To do so, we must examine and consider the entire contract in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *Id.*; *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We presume that the parties intended every clause to have some effect. *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt.*, *L.L.P.*, 301 S.W.3d 787, 794 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g). We give words their ordinary, generally accepted meanings unless the contract itself

13

shows that the terms have been used in a technical or different sense. *Doe v. Tex. Ass'n of Sch. Bds., Inc.*, 283 S.W.3d 451, 458 (Tex. App.—Fort Worth 2009, pet. denied).

Courts should be particularly wary of isolating individual words, phrases, or clauses and reading them out of context. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). Instead, "[w]e construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). We examine all writings relating to the same transaction. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999); *Fort Worth Transp. Auth. v. Thomas*, 303 S.W.3d 850, 857 (Tex. App.—Fort Worth 2009, pet. denied). We are also guided by the principle that a specific contractual provision controls over a general provision. *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 722 (Tex. App.—Fort Worth 2008, pet. dism'd).

## F. Relevant Provisions of JUA

Because we must construe the JUA in its entirety, and because all of the provisions of the JUA must be examined to understand the underpinnings of the parties' intent and purpose, we will excerpt the relevant provisions below.

14

Article I, entitled "Scope of Agreement," subsection (c) states, "It is the intention of the parties that adequate telephone service shall be made available to the widest practicable number of rural users in the above territory." In Article III, the JUA sets forth specifications for the poles that are to be jointly used and states that such poles

> shall at all times be in conformity with accepted modern methods such as those suggested in Edison Electric Institute Publication No. M12 and shall at all times conform to the requirements of the National Electrical Safety Code, Fifth Edition . . . except where the lawful requirements of public authorities may be more stringent.

Article IV sets forth a procedure requiring Verizon to request permission in writing on a delineated, attached form before "mak[ing] use of [Tri-County's] poles." It further states, "Whenever either party desires to reserve space for its attachments on any pole owned by the other party, *either as initial space or additional space on such pole*, it shall make written application therefor . . . [and] the owner . . . shall have the right to reject the application." [Emphasis added.] The JUA also requires a party desiring to change "the character of its circuits on jointly used poles" to give sixty days' notice to the other party and also provides guidelines for resolving any dispute if the other party failed to timely approve the change.

Article V(b) governs how the joint use of each party's poles is to be established, including a provision providing guidance for the ownership of such poles:

15

(b)　In any case where the parties hereto shall conclude arrangements for the joint use of any new poles to be erected, and the party proposing to construct the new poles facilities already owns more than its proportionate share of joint poles, the parties shall take into consideration the desirability of having the new pole facilities owned by the party owning less than its proportionate share of joint poles so as to work towards such a division of ownership of the joint poles that neither party shall be obligated to pay to the other any rentals because of their respective use of joint poles owned by the other.

The JUA further provides formulas for the allocation of costs between the parties for the construction of new poles, depending on which party's usage requirements necessitated new poles. The cost of maintenance of a joint-use pole is allocated to the owner of that pole.

Article X provides a mechanism for either party to abandon a jointly used pole by giving the other party sixty days' prior notice; if at the end of that sixty-day period, the owner removes all of its attachments from the pole, the other party may, if it still has attachments on the pole, keep those attachments in place and pay the abandoning party "the then value in place of the pole . . . but in no case an amount less than the net salvage value of the pole." Subsection (b) provides: "The licensee may at any time abandon the use of a joint pole by giving due notice thereof in writing to the owner and by removing therefrom any and all attachments it may have thereon."

Pole rental is calculated on January 1 of each year based on "the perpetual inventory of poles as reflected on the latest application and permit."[5] Article XI, the rental paragraph, was amended in all of the JUA amendments except the 1998 amendment to the Southwestern States contract. The 1993 amendment to the Southwestern States contract stated as follows:

> The rentals per pole due from either party as licensee to the other party as owner *shall be based on the equitable sharing of the economics of joint use as provided for in Appendix B*. Subject to the provision of Article XII, $8.82 per annum shall be paid by [Tri-County] for each jointly-used pole owned by [Verizon] and $7.25 per annum shall be paid by [Verizon] for each jointly-used pole owned by [Tri-County]. The smaller total sum shall be deducted from the larger and [Tri-County] or [Verizon], as the case may be, shall pay to the other the difference between such amounts. [Emphasis added.]

The 1981 amendment to the Continental contract changed Article XI(d) to read as follows: "Subject to the provisions of Article XII, $9.37 per annum shall be paid by [Tri-County] for each jointly used pole owned by [Verizon], and $6.25 per annum shall be paid by [Verizon] for each jointly used pole owned by [Tri-County]."

> Article XII, entitled "Periodical Adjustment of Rentals," reads in its entirety:
>
> (a)    At any time after 5 years from the date of this Agreement and at intervals of not less than 5 years thereafter, the rentals applicable under this Agreement shall be subject to joint review and adjustment as provided for under Section (b) of this Article upon the written request of either party. In case of adjustment of rentals as herein provided, the new rentals agreed

---

[5]Although the wording of this part of Article XI differs in the Continental contract, it is substantively the same.

17

upon shall apply starting with the annual bill next rendered and continuing until again adjusted.

(b)    *All adjustments of rental shall be in accord with the provisions of Appendix B,* and any changes shall take into account the cost factors originally involved in all joint use existing at that time under this Agreement.  [Emphasis added.]

Appendix B, referred to in, and attached to, both the Southwestern States

and Continental contracts is set forth below:

This Appendix describes the basic principles and guides which have been used under this Agreement in setting the rents specified in Article XI and which are to be used in making periodical adjustments of rentals as provided for in Article XII.

Under these principles the rentals are intended, in so far as it is practicable, to result in a sharing of the economies realized by the joint use of pole plant in proportion to the relative costs of separate pole line construction.

The procedures outlined herein take into account the following objectives:

1.   An equitable division of savings regardless of the number of jointly used poles owned by each party.

2.    Rental rates applicable universally in the area covered by the Agreement regardless of whether the pole lines involved are initially constructed with joint use in view or are existing lines modified for joint use.

3.    Appropriate allowance in the rental rates for additional costs incurred by each party in supplying 'normal joint poles', as defined in the Agreement, and the costs of other items required in the joint use of poles which would not be incurred in separate line construction.

4.    Rentals based on the costs of "typical miles" of separate lines, of newly constructed joint lines and of existing lines modified to make them suitable for joint

18

use.  The 'per mile' values of rentals are then reduced to 'per pole' values for purpose of simplifying tabulations and to provide for the joint use of scattered poles.

The rentals are the dollar values resulting from the licensee paying to the owner, as annual rental, an amount representing the annual charge on a separate line for the licensee less the sum of (a) the annual charges on the additional costs incurred by the licensee in establishing joint use and (b), the licensee's share of the total annual savings.  This share is the ratio of the Licensee's typical separate line costs to the sum of the typical separate line costs of each of the parties.

The annual rent payable can also be stated as follows:

| Licensee's annual rent | (Equals) | Annual charges saved by licensee through not having to build a separate line | (Less) | Licensee's appropriate percentage | (Of) | Total savings in an[n]ual charges realized through joint use |
|---|---|---|---|---|---|---|

The cost in place of a line of poles is made up of a number of factors including such items as right-of-way solicitation, clearing, staking, direct labor and material costs of bare poles in place and pro rata shares of construction supervision and overhead.  These costs, for a specific area, may differ considerably from corresponding costs in other parts of the country.  These variations in pole line costs will, however, affect both power and telephone lines to about the same degree.

The parties to this contract will mutually agree on the average cost of a typical mile of 35 foot, class 6 poles in place in their common area.  Below are tabulated appropriate rentals over a range of typical mile costs.  From this tabulation, the *parties shall use the rental payments associated with the value nearest to the agreed upon average cost.*

19

RENTAL PAYMENTS

| WHERE THE MUTUALLY AGREED UPON AVERAGE COST PER MILE OF 35 FOOT CLASS 6 POLES IN PLACE APPROXIMATES | THE TELEPHONE COMPANY'S ANNUAL RENTAL PAYMENT PER POLE TO THE COOPERATIVE WILL BE | THE COOPERATIVE'S ANNUAL RENTAL PAYMENT PER POLE TO THE TELEPHONE COMPANY WILL BE |
|---|---|---|
| $350.*[6] | $1.00 | $1.70 |
| 410. | 1.10 | 1.80 |
| 470. | 1.20 | 1.90 |
| 530. | 1.30 | 2.00 |
| 590. | 1.40 | 2.10 |
| 650. | 1.50 | 2.20 |
| 710. | 1.60 | 2.30 |
| 770.** | 1.70 | 2.40 |

*Rentals associated with this amount are minimum and applicable for all lower costs.

**If average costs are substantially higher than this value, appropriate rentals should be determined by agreement.

[Emphasis added.]

The default provision, Article XIII, provides that if either party defaults in its obligations for thirty days after written notice from the other party, the nondefaulting party can "suspend the rights of the party in default in so far as concerns the granting of future joint use" and if after such a suspension, the defaulting party remains in default for sixty days thereafter, the nondefaulting party can terminate the JUA "as far as concerns the future granting of joint use."

---

[6]Although the table and the notes delineated by asterisks are included in Appendix B to the Southwestern States contract, the amounts and at least the first asterisk are crossed out in the Appendix B attached to the Continental contract. Although the second asterisk is not crossed out in the Continental contract, the number it is next to is crossed out.

The default provision further gives the nondefaulting party the option of fulfilling the defaulting party's obligation with the right of reimbursement from the defaulting party for the expense.

Finally, Article XX of the JUA, entitled "Term of Agreement," states,

> Subject to the provisions of Article XIII, Defaults, herein, this Agreement shall remain in effect until terminated at the end of 25 years from the date hereof or thereafter upon the giving of written notice to the other party not less than three years prior to the date of termination.

## G. Analysis

### 1. JUA Contemplates Removal of Attachments Upon Termination

The initial issue we must resolve is whether Verizon is required to remove its existing attachments from Tri-County's poles upon termination of the JUA under Article XX; this is a basis for Tri-County's breach of contract claim and its alternative trespass claims. Because the termination provision in Article XX does not expressly state that all attachments to joint use poles must be removed upon termination, the parties argued in the trial court and on appeal that Texas law regarding leases applies to govern the disposition of the attachments upon termination. Tri-County cites cases holding that Texas law disfavors perpetual leases and the common law that a landlord has the right to receive the property back at the end of the term; Verizon cites law in support of its argument that the parties intended in the JUA to create a perpetual right to lease the poles. Verizon also argues that the JUA "plainly (1) limit[s] termination of the right to

21

occupy utility poles to the 'future granting of joint use' and (2) require[s] that new rental rates be 'agreed upon.'"

Before applying common law regarding the disposition of property at the end of a lease term, we must first determine whether the JUA itself contemplates that each party's attachments should be removed from the other's poles upon the exercise of the termination provision in Article XX; in doing so, we must consider the context of the entire JUA and its overriding purpose. *See, e.g.*, *NP Anderson Cotton Exch.*, *L.P.*, 230 S.W.3d at 463. That purpose is clearly stated in the JUA itself: to provide "adequate telephone service . . . to the widest practicable number of rural users" (Article I) with as equitable of a division of poles as possible so as to come as close as possible to the net result that neither party would have to pay rent to the other (Article V(b)). To that end, the JUA allocates costs of pole maintenance, construction, and load (Articles IV, VII, and VIII).

Although Article XX does not expressly state that removal of attachments to a joint use pole is required upon termination of the JUA, another provision does contemplate when removal is required: Article X requires the removal of a nonowner's attachments to a joint use pole in the event the nonowner decides it no longer wants to utilize the pole as a joint pole, which the owner may do at any time:

> (a) If the owner desires *at any time* to abandon any jointly used pole, it shall give the licensee notice in writing to that effect at least 60 days prior to the date on which it intends to abandon such pole. If at the expiration of said period the owner shall have no attachments on such pole but the licensee shall not have removed

22

all of the attachments therefrom, such pole shall thereupon become the property of the licensee, and the licensee shall save harmless the former owner of such pole from all obligation, liability, damages, cost, expenses or charges incurred thereafter, and not arising out of anything theretofore occurring, because of, or arising out of, the presence or condition of such pole or of any attachments thereon; *and shall pay the owner the then value in place of the pole to the licensee* but in no case an amount less than the net salvage value of the pole to the owner as provided in Appendix A attached hereto. The former owner shall further evidence transfer of title to the pole by means of a bill of sale. . . .

(b)     The licensee may *at any time* abandon the use of a joint pole by giving due notice thereof in writing to the owner and by removing therefrom any and all attachments it may have thereon. The licensee shall in such case pay to the owner the full rental for said pole for the then current year.  [Emphasis added.]

This provision shows that the parties intended that nonowner attachments would be allowed to remain only on owner-designated joint use poles for which rental is paid unless the nonowner desired to purchase the pole.

The considerable investment involved in providing such widespread telephone service as possible, in addition to ensuring continuing access to telephone service in more rural areas, are presumably two of the reasons for the restriction of termination of the JUA until the expiration of at least twenty-five years from its effective date.  *See, e.g.*, *Pub. Util. Comm'n of Tex. v. Tex. Tel. Ass'n*, 163 S.W.3d 204, 207 (Tex. App.—Austin 2005, no pet.) ("One of the goals of the Federal Communications Commission ('FCC') is to ensure that all Americans have access to affordable phone service.").  The plain language of that provision, Article XX, imposes no restriction on the termination of the JUA

23

after the initial twenty-five year period other than that three years' prior notice must be given.

Verizon argues that the initial clause, "Subject to the provisions of Article XIII, Defaults, herein," imposes the requirements of the default provision into the termination provision; in other words, that the potential and logical consequences of a party's termination of the JUA are "subject to" and thus limited by the remedies outlined in the default provision. But Verizon has confused the termination and default provisions in the JUA. In the context of the entire JUA, this introductory clause must be construed to modify and provide an exception to the part of the termination clause that sets a per se initial term of twenty-five years. *See Spiritas v. Rabinowitz*, 544 S.W.2d 710, 718–19 (Tex. App.—Dallas 1976, writ ref'd n.r.e.). For the default provision to provide such an exception, it must be different in some way from the termination provision. Thus, referencing the default provision, the construction that contextualizes the two most clearly, in furtherance of the purpose of the JUA, is that the only exception to the twenty-five year initial term—or subsequent three-year lead time of later termination—is that a nondefaulting party can deny future attachments to joint poles in the event of a default within the initial twenty-five-year term. Importantly, the default provision does not suspend the defaulting party's obligation to pay rental for then-current attachments during an event of default. Thus, to construe the termination provision to allow each party to continue using the other's poles rent-free after the termination date would mean the termination provision would have

24

no effect at all. Accordingly, we construe the termination provision to require that each party remove its attachments from the other's joint use poles; to do so otherwise would render the entire purpose of a termination provision meaningless and would convert the JUA into a perpetual right governed only by common law, which is not contemplated by the remainder of the JUA. *See Wood Care Ctrs., Inc. v. Evangel Temple Assembly of God of Wichita Falls, Tex.*, 307 S.W.3d 816, 821 (Tex. App.—Fort Worth 2010, pet. denied) (resolving potential conflict of termination provisions in lease by interpreting one to provide an exception to the other); *cf. Ethan's Glen Cmty. Ass'n v. Kearney*, 667 S.W.2d 287, 291 (Tex. App.—Houston [1st Dist.] 1984, no writ) (holding that permission to extend patio fences to encompass common area of development was not irrevocable despite homeowners' expenditures of money and labor because to do so "would, in effect, create a perpetual easement across the plaintiff's land"). This result is not undercut by the appellate court's reasoning in *Philpot v. Fields*, relied on by Verizon. 633 S.W.2d 546, 548 (Tex. App.—Texarkana 1982, no writ). The court in that case based its decision primarily on the intent of the parties as clearly expressed in the lease at issue, which is what we have done here. *See id.*

Moreover, Article VI of the JUA makes it clear that the parties' occupation of joint use poles is subject to the existing property rights of other landowners, and it expressly disavows any warranty of easement or right-of-way rights. To the extent then that Verizon is using Tri-County's poles pursuant to easement

25

rights granted to Tri-County by a landowner, Verizon's use and occupation of the poles is subordinate to the duration and scope of those easements. *See Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002); *CenterPoint Energy Houston Elec. LLC v. Bluebonnet Drive, Ltd.*, 264 S.W.3d 381, 387–88 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Thus, this provision also weighs against a conclusion that the parties intended a perpetual lease of the joint use poles.

We conclude and hold that the trial court erred by denying Tri-County's motion for partial summary judgment to the extent it sought an order that (a) after termination, Verizon became a holdover tenant[7] and that (b) Tri-County had the right to demand removal of Verizon's attachments to its joint use poles as of the termination date.[8]

### 2. Trespass-Based Claims

Verizon argues that if termination of the JUA requires it to remove its attachments from the joint use poles, it is nevertheless entitled to summary

---

[7]*See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 915–16 (Tex. 2013) (defining "[a] tenant who continues to occupy leased premises after expiration or termination of its lease [as] a 'holdover tenant'").

[8]Verizon characterizes the requests in Tri-County's motion for partial summary judgment as pleadings seeking declaratory judgment relief; however, Tri-County did not specifically seek the partial summary judgment under its pleading for declaratory relief. Questions of law are appropriate matters for summary judgment, including partial summary judgment. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222 (Tex. 1999); *see, e.g.*, *Bassett v. Am. Nat'l Bank*, 145 S.W.3d 692, 695–97 (Tex. App.—Fort Worth 2004, no pet.).

judgment on Tri-County's trespass claims because by demanding rental for the period after termination of the JUA, Tri-County elected to treat it as a tenant at will, subject to the terms of the JUA, rather than as a trespasser.[9] *See Coinmach Corp.*, 417 S.W.3d at 916.

### a. Applicable Law

In *Coinmach*, the supreme court explained the law regarding the status of a tenant who remains in possession of leased premises after the expiration of the lease term:

> A tenant at will is a holdover tenant who "holds possession with the landlord's consent but without fixed terms (as to duration or rent)." Because tenants at will remain in possession with their landlords' consent, their possession is lawful, but it is for no fixed term, and the landlords can put them out of possession at any time. By contrast, a tenant at sufferance is "[a] tenant who has been in lawful possession of property and wrongfully remains as a holdover after the tenant's interest has expired." The defining characteristic of a tenancy at sufferance is the lack of the landlord's consent to the tenant's continued possession of the premises. With the owner's consent, the holdover tenant becomes a tenant at will; without it, a tenant at sufferance.

> A lease agreement may provide that its terms continue to apply to a holdover tenant. But if, as here, the lease does not address the issue, and if the parties do not enter into a new lease

---

[9]Verizon did not move for summary judgment on the opposite ground: that treating it as a tenant-at-sufferance precluded a claim for breach of contract for the failure to pay rent during the wrongful holdover. *See Coinmach Corp.*, 417 S.W.3d at 917. Verizon also alleges in footnote 7 of its brief that Tri-County voluntarily dropped its holdover tenancy claim in the Second Amended Petition; however, Tri-County's alternative breach of contract and trespass claims are not only based on the allegation that Verizon owes Tri-County damages for remaining on its poles after the termination date, Tri-County uses the term "holdover tenant" in its allegations as to both theories of recovery.

agreement, the parties' conduct will determine whether the holdover tenant becomes a tenant at will or a tenant at sufferance. "Under the common law holdover rule, a landlord may elect to treat a tenant holding over as either a trespasser"—that is, a tenant at sufferance—"or as a tenant holding under the terms of the original lease"—that is, a tenant at will. Thus, an implied agreement to create a new lease using the terms of the prior lease may arise if both parties engage in conduct that manifests such intent. If the tenant remains in possession and continues to pay rent, and the landlord, having knowledge of the tenant's possession, continues to accept the rent without objection to the continued possession, the tenant is a tenant at will, and the terms of the prior lease will continue to govern the new arrangement absent an agreement to the contrary. The mere fact that the tenant remains in possession, however, is not sufficient to create a tenancy at will; unless the parties' conduct demonstrates the landlord's consent to the continued possession, the tenant is a tenant at sufferance.

*Id.* at 915–16 (citations omitted). The supreme court went on to hold that the parties' conduct in that case—which had been tried to a jury—showed (1) that the landlord did not consent to the holdover and thus elected to treat the tenant as a tenant at sufferance, (2) that no lease governed the conduct of the parties during the holdover period, and, therefore, (3) that the landlord could only recover damages attributable to the holdover period under its trespass theories rather than a breach of contract theory. *See id.* at 916–17, 922–23.

We must, therefore, determine if Verizon conclusively proved that Tri-County elected to treat it as a tenant at will or if a fact issue exists.

### b. Evidence of Parties' Post-termination Conduct

Tri-County's 2005 termination letter indicated, "Termination will be effective at the close of business on February 1, 2008. According to Article XX, Verizon must remove its facilities from Tri-County Electric poles by termination date."

28

This appears to show that Tri-County initially did not consent to Verizon's holdover tenancy.

But the summary judgment record also contains correspondence between Tri-County and Verizon indicating that Tri-County and Verizon attempted to negotiate either an amendment to the JUA or a new agreement after the termination date. A May 16, 2007 email from David Moore with Tri-County to Stuart Shiller with Verizon indicates that Tri-County was interested in negotiating amendments to the JUA. Another email from Moore to Shiller dated June 29, 2009, over a year after the termination date, stated, "I would like to meet . . . . We need to start the process of negotiating a new amendment to the joint use agreement between Verizon and Tri-County Electric. I intend to have our outside counsel, Rebecca Price, present at the meeting. You may also bring counsel." Another email dated September 25, 2009 acknowledged that Verizon had offered to "purchase poles to achieve a parity ratio of 45% [Verizon] and 55%" Tri-County and showed that the parties had exchanged draft documents. The email also stated, "During our last meeting, you indicated that you intended to review the termination provisions of *the current agreement* and [Verizon's] rights after termination. Could you share with us the results of that review?" [Emphasis added.] Finally, a third email dated October 27, 2009 stated:

> I misspoke concerning the rental rate that Tri-County will accept for 2008. We have billed for the 2008 cont[r]acts in an invoice dated February 2, 2009. I have attached a scanned copy of the invoice. Tri-County . . . will only accept the full amount for the 2008 cont[r]acts. If we negotiate some other amount with a new

29

agreement, then any difference will be refunded or credited as appropriate.

The record also contains copies of invoices from Tri-County to Verizon for pole rental due in 2009, 2010, 2011, and 2012.

Tri-County's counsel sent a demand letter to Verizon dated January 21, 2010, which stated as follows:

> Our firm represents Tri-County Electric Cooperative, Inc. in connection with the attachments to its poles and specifically the attachments of your company Verizon. I have your letter of December 23, 2009 to Mr. David Moore of Tri-County. Enclosed you will find your company's check for annual pole attachment rental which is not consistent with the invoice or the prior [JUA].
>
> The invoice was billed in accordance with a calculation under Appendix B to the now terminated [JUA]. That agreement was terminated pursuant to notice given you dated January 20, 2005. Pursuant to the agreement you had three years to remove your attachments from Tri-County's poles but did not do so. Your continued occupancy of those poles makes you a holdover tenant, holding over under the prior [JUA].
>
> Your conclusion is that, because the agreement was terminated, your occupancy on those poles is not governed by the prior agreement and rate calculation. You are incorrect. *As with any holdover tenant, under the law, the prior agreement governs the time you are holding over even though you may be and are a trespasser on those poles.*
>
> In connection with the negotiation of a new rate, you have proposed the FCC Telecom formula. You know of course that the formula has no application to Tri-County. As an electric cooperative, Tri-County is excluded from the FCC jurisdiction over pole attachment rates as that is left to state regulation. As you also know, Texas has not chosen to exercise jurisdiction or to regulate pole attachment rates or contracts. Therefore, your entitlement to be on the poles of Tri-County is purely a matter of negotiated contract and presently, *you have refused to pay as a holdover tenant under the*

30

*prior agreement* and also chosen not to remove your attachments from the poles.

. . . .

Tri-County Electric is willing to sit down with you and negotiate a new pole attachment rental agreement which would include new rates. It is not, however, willing to apply the FCC Telecom formula or to accept a rate such as you propose in your December 23 letter. As a good faith gesture, you should pay the rental rates billed you pursuant to Appendix B for 2008 and 2009 and contact me to arrange for a time to discuss and hopefully negotiate a new agreement. If you choose not to proceed in this manner I will have no choice but to recommend to my client that it pursue all appropriate remedies available to it, *which may include commencing litigation against Verizon for recovery of rental rates for the years 2008 and 2009 based on the Appendix B formula as a holdover tenant*, for costs and attorneys' fees, and for an appropriate order with respect to your continued occupancy of space on Tri-County's poles.

It is Tri-County's intent to negotiate in good faith a rental rate which adequately covers its costs resulting from your occupancy on its poles. [Emphasis added.]

In a subsequent letter dated August 24, 2010, Tri-County's counsel wrote,

Unfortunately, it appears that we are at an impasse in that we cannot agree with your positions as stated in your letter with regard to pole attachment rates that should apply to Verizon's occupation of Tri-County poles.

By this letter, please accept this as Tri-County's directive that Verizon remove all attachments from our poles as soon as possible. Further, we expect Verizon to pay the full amount owed for its attachments including not only pole attachment rates but also related fees in the present amount of $153,129.32 for 2008 and 2009 for a total amount of $306,258.64. Please be advised that if Verizon does not begin to remove all attachments from Tri-County poles immediately and complete that process in a reasonable time, and pay all amounts due and owing as stated herein, Tri-County will be left with little recourse but to pursue an action against Verizon in court to get a judgment directing Verizon's removal from our poles

and an award of damages for amounts owed which may include not only the past due rental rates, fees and penalties but also attorneys' fees, pre- and post-judgment interest and other costs incurred.

In Moore's affidavit attached as summary judgment evidence, he explains,

23. Despite numerous demands, Verizon continually refused to pay the $29.21 rental rate during the three years after the Notice of Termination. It was always our intention to hold Verizon to its obligation to pay the $29.21 rate between the time of the Notice of Termination, January 20, 2005, to the time by which Verizon was supposed to remove its facilities, February 1, 2008. It was never our intent at [Tri-County] to accept the $7.25 per pole paid by Verizon as full payment, or to waive our right to collect the full amount owed between January 2005 and January 2008 ($29.21 per pole) by applying Verizon's payments at the $7.25 rate to their account. Our intent was to reflect a credit to their account for the amount paid.

24. On or about August 24, 2010, [Tri-County] sent another demand that Verizon remove its attachments from its poles. To date, Verizon has failed and refused to remove its attachments from [Tri-County's] poles and continues to utilize its attachments to those poles for the delivery of its services. Verizon has also refused to pay [Tri-County] the rental rates that [it] has demanded for the use of such attachments from February 1, 2008 to the present. When payments for a lesser amount were received from Verizon during this time period, [Tri-County] rejected all such payments on the advice of its attorneys. *At no time since February 1, 2008, has [Tri-County] agreed or otherwise consented to allow Verizon to remain attached to its poles.*

25. Given Verizon's refusal to remove its attachments from [Tri-County's] poles, and its refusal to pay the $29.21 rate that had been demanded for the January 2005 to January 2008 time period, [Tri-County] again calculated the rental rate per pole that should be paid by Verizon to [Tri-County] for the time period of January 2008 to January 2013 to be $37.04, $39.76, $40.95, $40.53, and $40.53 respectively. It was always our understanding at [Tri-County] that the provisions of the Contract that implied that the parties had a right to request a rate adjustment no more than every five years applied only once an appropriate rate calculated in accordance with Appendix B was being paid by the parties. That never occurred

32

between [Tri-County] and Verizon after [Tri-County] first requested the rate adjustment in 2003. [Emphasis added.]

### c. Fact Issue Exists

Verizon contends that Tri-County consented to its possession, thus precluding a trespass claim, because Tri-County has not removed its attachments from Verizon's poles, Tri-County has invoiced Verizon for rental after the termination, Tri-County has negotiated with Verizon to enter into a new agreement with increased rates, and Tri-County has demanded rental under the terms of the JUA post-termination. There is at least a fact question as to whether Tri-County maintains any attachments on Verizon poles; the record contains an excerpt from Moore's deposition in which he states that he is not sure but that he thinks that Tri-County may not have any attachments on Verizon's poles. What the record does show is that Tri-County told Verizon to remove its attachments on the termination date in its termination notice; several months before the termination date, Tri-County communicated to Verizon that it was interested in amending the JUA; Tri-County billed Verizon for rental after the termination date at a different rate from the last amended rate in the JUA but purportedly in accordance with the formula set forth in Appendix B of the JUA; Verizon tendered rental for the year 2008 that Tri-County rejected; until August 2010, Tri-County's counsel's position to Verizon was that its holdover was subject to the terms of the JUA but at the rental demanded by Tri-County; and as of August 24, 2010, Tri-County again demanded that Verizon remove all of its attachments.

33

We conclude and hold that the evidence raises a genuine issue of material fact as to whether Tri-County consented to Verizon's holdover as a tenant at will under the terms of the JUA. Tri-County made at least two demands that Verizon remove its attachments and it also rejected rental from Verizon. *See ICM Mortg. Corp. v. Jacob*, 902 S.W.2d 527, 533 (Tex. App.—El Paso 1994, writ denied) (holding that parties' conduct did not show intention that holdover was tenancy at will when new owner after foreclosure did not respond to inquiries by former lessee seeking to purchase property, refused to accept rent from her, told her to "sit tight" until it could obtain clear title to the property, and instituted forcible detainer proceedings); *see also, e.g.*, *Wood v. Kennedy*, 473 S.W.3d 329, 335 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing law that tenant at sufferance is liable for reasonable rental value of property during holdover). But Tri-County also asserted, in its correspondence and second amended petition, that all of the terms of the JUA applied to the holdover except for the rental amount. In *Street-Whittington Co. v. Sayres*, cited by both parties, the trial court concluded that whether the tenant's holdover was a tenancy at will or tenancy at sufferance, based on evidence of the parties' conduct, was a question that should have been submitted to the jury. 172 S.W. 772, 776 (Tex. Civ. App.—Amarillo 1915, no writ). We believe the same reasoning applies here and that Verizon failed to prove conclusively as a matter of law that Tri-County elected to treat it as a tenant at will rather than as a tenant at sufferance. In accordance with the law as stated in *Coinmach*, whether Tri-County can recover damages

34

under a breach of contract theory or trespass theory, then, depends on the resolution of this fact issue. Therefore, we conclude and hold that the trial court erred by granting summary judgment for Verizon on Tri-County's alternatively pled trespass-based claims.

Additionally, because we conclude that a fact issue exists, we also hold that the trial court did not err by denying the remaining relief sought in Tri-County's motion for a partial summary judgment except its request for a partial summary judgment as to whether, as a matter of law, the JUA requires rental increases to be determined in accordance with the formula set forth in Appendix B, which we discuss below.

### 3. Breach of Contract Claims

In its motion for summary judgment, Verizon asserted that Tri-County cannot maintain any of its breach of contract claims for unpaid rental because the JUA requires it to pay increased rentals only if they are "agreed upon" and that Tri-County failed to comply with the JUA by demanding rental not required by the JUA and in violation of the provision that allows a rental increase only in five-year intervals. Tri-County argues that the parties agreed in the JUA to determine rent increases according to the formula set forth in Appendix B. Although there is a fact question as to whether Tri-County elected to treat Verizon as a tenant at will—and thus whether Tri-County can even recover in accordance with the JUA—we will address this issue because a resolution in Verizon's favor would preclude Tri-County's breach of contract action. *See Mustang Pipeline Co. v.*

35

*Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

### a. Rental Calculation

Article XI(d) of the JUA, as amended, uses the generally mandatory term "shall" in providing that "[t]he rentals per pole due from either party as licensee to the other party as owner *shall* be based on the equitable sharing of the economics of joint use as provided for in Appendix B." *See Lesikar v. Moon*, 237 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Nothing else in the context of this provision or the remainder of the JUA indicates that the parties intended the word to be used permissively; thus, Appendix B and "the equitable sharing of the economics of joint use" must be the basis for determining rentals due under the JUA.

Additionally, the amendments all begin the rent provisions with the clause, "Subject to the provisions of Article XII." Article XII provides for the "joint review and adjustment" of rentals at intervals of no less than five years. But that "joint review and adjustment" is to be "as provided for under Section (b)" of Article XII, which states that "*[a]ll* adjustments of rental *shall be* in accord with the provisions of Appendix B, and any changes *shall* take into account the cost factors originally involved in *all* joint use existing at that time under" the JUA. [Emphasis added.] Thus, both Article XI and Article XII use similar mandatory language. *See id.*

36

Appendix B reiterates that cost factors are to be considered and states that the basic principles set forth therein "*are to be used* in making periodical adjustments of rentals as provided for in Article XII." [Emphasis added.] It concludes its formula tabulation guide with the statement that "the parties shall use the rental payments associated with the value nearest to the agreed upon average cost." Thus, the language in Appendix B shows that there is more to the determination of rental than simply the agreement of the parties without any guiding factors; in negotiating an agreement as to rental, they are to employ the formula and "basic principles" listed in that Appendix. It is not difficult to imagine the purpose for this: just as the lengthy initial term would help the parties achieve more of a return on their infrastructure investment and further the purpose of facilitating the provision of services to more difficult and costly to serve and reach rural areas, a provision allowing the parties the flexibility to negotiate rental based on an equitable formula would allow the parties to account for changes in cost, market, and other factors that would affect their own expenses while still working toward an equitable sharing of costs.

Verizon contends that language included with the asterisk in the table of Appendix B of the Southwestern States contract trumps all of the remaining language in Appendix B. That language, appended to the last and highest rental amount in the table, states that "[i]f average costs are substantially higher than this value, appropriate rentals should be determined by agreement." Thus, Verizon contends that because all of the rental amounts listed in the JUA, as

37

amended—which were presumably tabulated according to the formula in Appendix B—are substantially lower than the current average costs as tabulated according to the formula in Appendix B, this appended statement nullifies the formula in Appendix B altogether as to future periodic adjustment of rentals and that such adjustments are only bound by what the parties can mutually agree to.

The table in Appendix B shows what the parties had agreed to be—in accordance with Appendix B—"the average cost of a typical mile of 35 foot, class 6 poles in place in their common area . . . over a range of typical mile costs." Therefore, the addition of the language next to the double asterisk at the end of the table simply reflected that once the average cost of a typical mile of 35 foot, class 6 poles in place in their common area exceeded the last agreed-upon amount in the table, the parties would again have to agree on a new average cost per typical mile, taking into account the factors set forth in Appendix B, such as "right-of-way solicitation, clearing, staking, direct labor and material costs of bare poles in place and pro rata shares of construction supervision and overhead." Because such a calculation involves numerous factors, and takes into account costs incurred by both of the parties to the JUA—which presumably would differ as to each of them as well as fluctuate over time, it makes sense that the JUA would require "agreement" as to an average cost. But that does not mean, in the context of the JUA as a whole, that the "agreement" is not required to be based on the factors set forth in Appendix B. *Cf. Fischer v. CTMI, L.L.C.*, No. 13-0977, 2016 WL 83477, at *7–9 (Tex. Jan. 8, 2016) (construing provision

of contract that provided for future payment to be based on agreement as to applicable project completion percentages, holding that such a provision is not too indefinite to be enforceable, and observing that parties' future agreement was to be based on the "method or standard for determining the payments" set forth in the contract); *E & V Slack, Inc. v. Shell Oil Co.*, 969 S.W.2d 565, 566–67, 569–70 (Tex. App.—Austin 1998, no pet.) (describing, in context of class-certification appeal, lease arrangement between Shell and its service station lessors by which rental due would be calculated by a discounted formula depending on gas sales, taking into account numerous factors that would vary depending on location and gas prices).

Verizon's construction inevitably would lead to the instant dispute: Verizon contends that Tri-County breached the JUA by demanding unreasonably high rental, and Tri-County contends that what Verizon is willing to agree to is not only unreasonably low but also under market for similar industry-standard agreements. To construe the rental provision as Verizon urges would be to obviate the need for Appendix B altogether, and to say that rental would only be increased upon mutual agreement of the parties—with no guiding principles as to the purpose or reasonableness of their negotiations—would be no different than requiring the rental to be frozen for the entire term of the JUA, thus allowing Verizon to unilaterally block any proposed increases.

We conclude that Tri-County's interpretation of the rental provisions in the JUA is correct: the parties have the flexibility to negotiate and agree on

39

increased rental; however, their agreement must be based on calculations performed in accordance with Appendix B and nearest to the agreed upon average cost.[10]  Verizon's argument that Tri-County breached by demanding rental more often than every five years presumes that the JUA applies to the holdover term;[11] because we have determined that there is a genuine issue of material fact as to whether the JUA applied to the holdover term, we likewise hold that a fact issue exists as to this ground of Verizon's summary judgment motion as well.[12]

Therefore, we hold that the trial court erred by granting summary judgment for Verizon on this part of Tri-County's breach of contract claim.  However, we also conclude and hold that the trial court did not err by denying Tri-County's motion for a partial summary judgment order that "the Contract, including all amendments, governs the relationship of the parties and that Appendix B of the Contract governs the manner by which rents to be paid between the parties are

---

[10]Verizon has cited a 2011 decision by an administrative law judge in Arkansas holding to the contrary.  Neither this court nor the trial court are bound by that decision.  *See Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 734 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g).

[11]To the extent that Verizon contends that Tri-County violated Article XII by demanding increased rentals in 2005, 2006, and 2007—before the termination of the JUA—and that such a violation would preclude a post-termination breach of contract claim, we conclude that there is at least a fact issue.  Moore testified that the initial rental demand of $31.17 was the result of a clerical error.

[12]Because we hold that Verizon's interpretation is not supported by the JUA, we need not address Tri-County's argument that the language denoted by the asterisk was amended out of the JUA altogether.

40

to be determined" because it was not pled conditionally, i.e., in the event that Tri-County is found to have treated Verizon as a tenant at will rather than a tenant at sufferance, thus making the JUA applicable to the holdover tenancy.

### b. Inventory

Verizon also moved for summary judgment on Tri-County's claim that Verizon is responsible for the costs of the inventory because its breach of the JUA by underreporting pole attachments necessitated the inventory. According to Verizon, no provision of the JUA requires it to finance the inventory, and the undisputed facts show that it did not cause the need for the inventory.

Article IV requires a party to request permission from the other party in writing before making any attachments to a joint use pole or before changing the character of its circuits on a joint use pole. It also gives the owner the right to reject such an application. Moore's affidavit indicates that Tri-County became aware in late 2009 or early 2010 that Verizon had not been submitting requests for pole attachments, which he thought was unusual based on his experience in the industry. The subsequent inventory revealed substantially more attachments than had been agreed upon by the parties in the JUA as amended.

Generally, the measure of damages for breach of a contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed, which may include consequential damages. *See AZZ Inc. v. Morgan*, 462 S.W.3d 284, 289 (Tex. App.—Fort Worth 2015, no pet.); *Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 12 (Tex. App.—Dallas 2007, pet.

41

denied). To be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it; thus, consequential damages are generally not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998); *AZZ Inc.*, 462 S.W.3d at 289.

Tri-County has raised a genuine issue of material fact as to the foreseeability of such damages. The JUA requires each party to notify the other before making new or additional attachments and before making changes to circuit loading. Tri-County presented evidence that as of late 2009 or early 2010, Tri-County became aware that, unusually, Verizon had not been submitting requests for new attachments for "years." Because the very nature of the JUA is a sharing of costs in order to provide services and because rental is based on pole count, such underreporting would naturally result in the need for some party to engage in a count of the poles. Whether the inventory that was performed is accurate or whether the consultant's charges and scope were reasonable is not relevant to whether the type of damage is foreseeable.

We conclude and hold that the trial court erred by granting summary judgment for Verizon on this ground.

### c. Other Breach of Contract Claims

Verizon also moved for summary judgment on various theories on other parts of Tri-County's breach of contract claims.

First, Verizon contended that it was entitled to summary judgment on Tri-County's breach of contract claim for Verizon's alleged failure "to provide information in accordance with the requirements of Appendix B." Verizon argues that Appendix B does not require the exchange of information, that if it does, Tri-County itself did not provide information to Verizon, and that Tri-County was not damaged by the failure because it revoked the request after receiving public records with that information and because it did not use the information in making its new rate demand.

Although the JUA never expressly states that either party must provide cost information to the other, as we have stated, one of the overriding purposes of the JUA is the equitable sharing of costs; that purpose can be seen in the rental provisions as well as the provisions regarding the erection of new poles and the abandonment of poles. While it is understandable that in today's competitive market of telecommunications, companies negotiating contracts affecting the cost of providing services are not as willing to share information in such a way that it would affect their bargaining power, the purpose and spirit of the JUA—which was entered into during a very different environment regarding telecommunications—is that the parties will cooperate in the joint provision of services in a way that comes as close as possible to equalizing their expenses

43

so as to provide services to the maximum number of users possible. *See Tex. Bldg. Owners & Managers Ass'n v. Pub. Util. Comm'n of Tex.*, 110 S.W.3d 524, 527–28 (Tex. App.—Austin 2003, pet. denied) (reciting history of telecommunications regulation in Texas and federally, from geographic monopolies to a competitive marketplace). Thus, even though the JUA does not expressly state that the parties are required to share such information, one of its overriding purposes would be thwarted if they did not. *See Aycock v. Vantage Mgmt. Co.*, 554 S.W.2d 235, 237–38 (Tex. Civ. App.—Dallas 1977, writ ref'd n.r.e.) ("Since the lessor is obligated to propose a rate consistent with the factors enumerated, it must make that determination in good faith, and if it fails to act in good faith or fails to propose any rate at all, as it did in the present case, it may be deemed to have waived its right to propose the rate and thus to leave the matter for the court's determination.").

With regard to Verizon's waiver arguments, Tri-County points to evidence that it did provide an example of its costs to Verizon with an invoice dated January 24, 2012. That information is titled, "Tri-County – 2010 Appendix B Calculation – current w/ Initial Clearing and Adders." Additionally, it points to Moore's summary judgment affidavit, which states that although Tri-County obtained historical data from the FCC, its consultants later informed it that the rental calculation would be higher using the more current data. According to Moore, Tri-County nevertheless "made the decision to demand that Verizon pay only" the rate based on the historical data "even though our consultants at RASR

44

advised us that we were in fact entitled to a higher rate for 2005-07 rental years, because it was the rate that we had demanded for those rental years from the beginning." Waiver is ordinarily a fact issue; the record shows that Tri-County attempted to negotiate new rental rates and a new JUA with Verizon even after the termination date. *See In re Lennar Homes of Tex. Sales & Mktg., Ltd.*, No. 02-15-00174-CV, 2015 WL 4366046, at *2 (Tex. App.—Fort Worth July 15, 2015, orig. proceeding) (mem. op.). Thus, we conclude that the record shows at least a fact issue as to whether Tri-County abandoned its request for the correct, current information regarding Verizon's pole costs. For the same reason, we hold that there is a fact issue as to the damages element of this claim.

Second, Verizon contends that Tri-County "has never identified a single attachment that Verizon . . . made to a [Tri-County] pole without permission following termination," which we construe to be a no-evidence ground. However, Tri-County provided evidence that the total number of attachments found in the third-party inventory well exceeds the total number of attachments agreed upon by the parties in the JUA as amended. We hold that—combined with Moore's affidavit testimony that Verizon had gone for an unusual amount of time without seeking permission for new attachments under the JUA—this is enough to raise a fact issue as to whether Verizon made new attachments to Tri-County's joint use poles without first seeking permission as set forth in the JUA. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

45

Finally, Verizon argues that Tri-County's breach of contract claim based on Verizon's failure to negotiate in good faith fails because Verizon "did negotiate pursuant to the terms of the JUA[] and was not contractually required to provide information to [Tri-County] when doing so." Verizon claims Tri-County was the party who refused to negotiate in accordance with the JUA. Because we have already concluded that at least a fact issue exists as to whether Verizon breached the JUA by failing to give the requested information, we also hold that there is a fact issue on this facet of the breach of contract claim.

For these reasons, we conclude and hold that the trial court erred by granting Verizon summary judgment on Tri-County's breach of contract claims.

## 4. Declaratory Judgment, Attorney's Fees, and Exemplary Damages

Verizon moved for summary judgment on the remaining claims in Tri-County's petition generally because they are dependent on Tri-County's ability to recover on the breach of contract or trespass claims, which Verizon contended all fail. Because we have held that the trial court erred by granting summary judgment for Verizon on those claims, we likewise conclude that the trial court erred by granting summary judgment on the remaining claims on the ground that they are dependent on the breach of contract and trespass claims. Moreover, because the declaratory judgment claim must be remanded, Verizon is not entitled to summary judgment as to attorney's fees based on its argument that Tri-County cannot recover fees because they are not available in connection with the breach of contract and trespass claims.

46

But Verizon did independently challenge the exemplary damages claim on the ground that Tri-County "has not pointed to any evidence, let alone 'clear and convincing evidence' that [its] trespass damages 'resulted from fraud, malice, or gross negligence' as required to obtain such damages" under civil practice and remedies code section 41.003(a). Tri-County relies on this court's opinion in *Wilen v. Falkenstein* to show that a trespass can be malicious and that it has alleged similar behavior by Verizon in intentionally occupying its poles without paying any rent and in refusing to negotiate a new rental amount in accordance with Appendix B of the JUA. 191 S.W.3d 791, 800–01 (Tex. App.—Fort Worth 2006, pet. denied) (citing law that "[e]xemplary damages are recoverable for the tort of trespass if the trespass was committed maliciously" and holding evidence sufficient to show that Wilen's conduct showed a "specific intent to cause substantial injury to Falkenstein").

Malice is defined in the exemplary damages context as "a specific intent by the defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (West Supp. 2015). Specific intent means that the actor desires to cause the consequences of his act or that he believes the consequences are substantially certain to result from it. *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985). Malice may be proven by direct or circumstantial evidence. *Seber v. Union Pac. R.R. Co.*, 350 S.W.3d 640, 654 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

47

Tri-County presented evidence that Verizon, unusually, did not seek permits to add new attachments to Tri-County's joint use poles under the JUA for "years" before late 2009 or early 2010, that there was a significant discrepancy between the number of attachments counted in a 2010 third party inventory and the last agreed-upon pole attachment count upon which rental was being invoiced, and that Verizon has occupied Tri-County's joint use poles after the termination date without paying rental. This evidence could conceivably support an inference that Verizon intentionally stopped seeking permission for new attachments under the JUA to enhance its bargaining power in negotiating a new rental rate and, after termination of the JUA, that it held over for the same purpose. However, the evidence also shows that (1) Tri-County's actions regarding Verizon's holdover were not consistent as to whether it was treating Verizon as a tenant at will subject to the JUA or as a trespasser, (2) that Verizon disputed the applicability of the Appendix B formula, (3) that Verizon engaged in negotiation discussions with Tri-County around the termination date, (4) that Verizon tendered payment that Tri-County rejected, and (5) that Verizon attachments may have been miscounted in the third party inventory. *See Coinmach*, 417 S.W.3d at 922 ("[A] defendant will not be liable for exemplary damages when the trespasser acted 'in good faith,' 'without wrongful intention,' or 'in the belief that he was exercising his rights.'"). We conclude that Tri-County's evidence is equally consistent with an inference that Verizon held over in good faith. *See Soodeen v. Rychel*, 802 S.W.2d 361, 363–64 (Tex. App.—

48

Houston [1st Dist.] 1990, writ denied) (holding that plaintiff did not raise fact issue as to negligent entrustment because facts that plaintiff alleged contradicted defendant's affidavit statement that he did not entrust vehicle to alleged drivers were equally consistent with inference that defendant did not entrust vehicle to them). Under these facts, we conclude and hold that—should the fact issue regarding Tri-County's election as to Verizon's holdover tenancy be resolved in such a way that Tri-County's trespass claim survives—Tri-County failed to bring forward evidence sufficient to raise a fact issue as to whether any such trespass occurred with malice as defined by section 41.001(7). *See* Tex. R. Civ. P. 166a(i); *Hamilton*, 249 S.W.3d at 426.

Accordingly, we conclude and hold that the trial court did not err by granting summary judgment for Verizon on Tri-County's exemplary damages claim.

### 5. Disposition of First Issue

Having concluded that the trial court erred by granting Verizon's motion for summary judgment on all grounds except the ground complaining of Tri-County's exemplary damages claim, and having determined that the trial court erred by denying Tri-County's partial summary judgment motion requesting an order that (a) after termination, Verizon became a holdover tenant and that (b) Tri-County had the right to demand removal of Verizon's attachments to its joint use poles as of the termination date, we sustain the majority of Tri-County's first issue. We overrule the remainder of Tri-County's first issue.

49

## IV.     Remaining Issues

We need not address Tri-County's remaining issues because our disposition of its first issue requires us to reverse the trial court's award of attorney's fees to Verizon and remand that issue to the trial court along with the merits.  *See Leake v. Campbell*, 352 S.W.3d 180, 190 (Tex. App.—Fort Worth 2011, no pet.).

## V.     Conclusion

Having sustained Tri-County's first issue in part, we reverse the trial court's judgment for Verizon except as to Tri-County's exemplary damages claim only. We affirm the trial court's summary judgment for Verizon on Tri-County's exemplary damages claim.  We reverse the trial court's denial of Tri-County's motion for partial summary judgment in part and render an order that (a) after termination, Verizon became a holdover tenant and (b) Tri-County had the right to demand removal of Verizon's attachments to its joint use poles as of the termination date.  We affirm the trial court's denial of Tri-County's motion for partial summary judgment in all other respects.  Having reversed the majority of the trial court's judgment for Verizon, we remand the case for further proceedings consistent with this opinion.

/s/ Terrie Livingston
TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

DELIVERED:  February 11, 2016